REDACTED VERSION
CONTAINS CONFIDENTIAL BUSINESS INFORMATION

### UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.  20436

**Before The Honorable Thomas B. Pender**
**Administrative Law Judge**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ELECTRONIC DEVICES WITH COMMUNICATION CAPABILITIES, COMPONENTS THEREOF, AND RELATED SOFTWARE**<br><br>**APPLE INC.**<br><br>    **Respondent/**<br>    **Counterclaimant,**<br><br>    **v.**<br><br>**HTC CORPORATION**<br><br>    **Complainant/**<br>    **Counterclaim Defendant** | **Investigation No. 337-TA-808** |

## COUNTERCLAIM

Pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e), Respondent/Counterclaimant Apple Inc. ("Apple") asserts this Counterclaim against Complainant/Counterclaim Defendant HTC Corporation ("HTC") and in support hereof avers as follows:

## THE NATURE OF THE ACTION

1.    Apple asserts its counterclaims in response to the complaint filed in the United States International Trade Commission under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, and the Patent Laws of the United States, 35 U.S.C. §§ 100 *et seq*., in which HTC alleges that Apple infringes, *inter alia*, U.S. Patent No. 7,672,219 (the "'219 patent") and 7,417,944 (the "'944 patent") (collectively, "the ADC patents").

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

2.     This ITC Investigation is based on a complaint filed by HTC in retaliation against Apple for a case Apple brought to redress HTC's infringement of Apple's patented technology.  Specifically, Apple first brought suit against HTC in the International Trade Commission in March 2010.  *See In re Personal Data and Mobile Communications Devices and Related Software*, Inv. 337-TA-710 ("the 710 Investigation").  In July 2011, the Administrative Law Judge issued a final initial determination finding a violation of section 337 concluding that HTC's mobile devices infringed an Apple patent.  In December 2011, the Commission issued a final determination affirming the finding of infringement by HTC and violation of section 337. The Commission also issued an exclusion order precluding HTC from importing into the United States its infringing mobile devices.

3.     HTC launched the instant investigation to attempt to extort Apple into licensing HTC's products under threat of exclusion of Apple's popular products including Apple's iPhone, iPad, and iPod mobile devices.  HTC's lawsuit was not based on patented technology that HTC itself invented but rather HTC based its lawsuit on a slew of patents that HTC had acquired (except one of the eight patents) from two other entities shortly before filing the complaint in this Investigation.  HTC's claims under five of those patents have now been dismissed for lack of standing.  Two of the remaining patents – the '219 and '944 patents – were acquired from ADC Telecommunications, Inc., an entity formerly based in Minneapolis, Minnesota.  HTC has originally asserted that those patents are infringed based on Apple's implementation in its products of industry standards for compatibility with LTE wireless networks.  Specifically, on May 25, 2012, HTC served responses to Apple's contention interrogatories, and for the first time specifically accused Apple of infringing the ADC patents based solely on the fact that Apple devices contain baseband chips that implement the LTE

2

REDACTED VERSION
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

standard. *See, e.g.*, HTC Response to Contention Interrogatories, Exs. MM & ZZ. In contrast, Apple's prior ITC Investigation and the Commission's final determination in that case did not involve implementation of product specifications that had been standardized by industry groups.

4.       In light of the purported essentiality of the '219 and '944 patents, as discussed below, those patents should have been disclosed by HTC and ADC to the relevant standards setting organizations ("SSOs"), and commitments to license on fair, reasonable and nondiscriminatory terms ("FRAND") should have been made for their inclusion in standards and in evolving standards under development.  Neither HTC nor ADC has ever disclosed the existence of these patents to the relevant SSOs, but rather each have permitted standardization to occur and continue even though they each believed their patents could be used to block implementation of any LTE standard.  Further, neither ADC nor HTC has made any commitment to the SSOs with respect to the ADC patents to license such patents under FRAND terms.  ADC and HTC have deprived the SSOs of their ability to develop different product specifications as standards for LTE products that would not be essential to the practice of the patents in the manner asserted by HTC.  Instead, HTC and ADC have conspired to conceal from the SSOs the existence of the ADC patents and have purposefully evaded any obligations to license under FRAND terms, a course of conduct HTC continues even as it participates in work on evolution of these same standards. The object of this conspiracy and of HTC's conduct was to use the patents to sue Apple in the United States International Trade Commission, which is empowered to issue exclusion orders to stop Apple products from entering the United States.  Moreover, HTC and ADC conspired to and did deliberately conceal their wrongful conduct, not just by hiding it from the SSOs, but also by attempting to evade the requirement to submit their transaction for review by U.S. antitrust regulators under the Hart-Scott-Rodino Act.  HTC and

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

ADC attempted to manipulate and avoid their "HSR" reporting obligation ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ when in fact the

contract price was $75 million dollars (above one of the filing thresholds) and the value of the

deal was in the U.S. patents.  HTC has produced nothing and given no explanation to support its

"valuation" of the U.S. patents, and ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  The fact that HTC and ADC did not submit the transaction for

review as required by 15 U.S.C. § 18a and applicable regulations at the time, but rather

concealed it from law enforcement with a self-serving and bogus "valuation," is part of a "cover

up" that is yet further evidence they acted with deliberate and wrongful intent to harm

competition and Apple.

5.     HTC's unlawful conduct is an intentional violation of the antitrust laws of the

United States and Virginia, a fraud upon SSOs and its members, and a breach of obligations

owed to SSOs, its members and others using the standardized LTE technology.  Apple seeks an

injunction to prevent HTC's unlawful conduct from causing harm to competition in the markets

in the U.S. and Virginia for smart phones and tablet PCs, and the resulting injury to  to Apple on

account of the unlawful activities of HTC and ADC, as well as damages for the injury already

resulting from the harm HTC has caused by its anti-competitive conduct, fraud, breach of

contract and wrongdoing.

## THE PARTIES

6.     Apple is a California corporation having its principal place of business at 1

Infinite Loop, Cupertino, California 95014.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

7.     HTC is a corporation organized and existing under the laws of Taiwan with its

principal place of business at 23 Xinghua Rd., Taoyuan City, Taoyuan County 3309, Taiwan,

(R.O.C.).  HTC is registered to do business in Virginia and has a registered agent located at

National Registered Agents Inc., 526 King St. Ste. 423, Alexandria, Virginia 22314.  Service of

this Counterclaim is proper by service on HTC's counsel in this ITC Investigation.

## JURISDICTION AND VENUE

8.     The filing of these Counterclaims in the United States International Trade

Commission is authorized by 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e), with the condition

that the respondent/counterclaimant "shall immediately file a notice of removal with a United

States district court in which venue for any of the counterclaims raised by respondent would exit

under 28 U.S.C. § 1391."  Concurrently with this filing, Apple is filing a notice of removal of

these Counterclaims with the United States District Court for the Eastern District of Virginia.

9.     This Court has jurisdiction over this action pursuant to 19 U.S.C. § 1337(c),

the Federal Patent Act, 28 U.S.C. §1338, pursuant to its jurisdiction over disputes arising under

federal statutes, 28 U.S.C. § 1331, and also the jurisdiction of the federal courts over antitrust

claims under sections 4 and 9 of the Sherman Act, 15 U.S.C. § 4, 9, and section 15 of the

Clayton Act, 15 U.S.C. § 15.  This Court has supplemental jurisdiction over Apple's state law

claims against HTC under 28 U.S.C. § 1367.  Further, this Court may exercise diversity of

citizenship jurisdiction over Apple's state law claims against HTC since Apple is a citizen of a

state and HTC is a citizen of a foreign country and the value of the relief sought including

injunctive relief is more than $75,000.  28 U.S.C. § 1332.

10.     This Court has personal jurisdiction over HTC because, among other things,

HTC regularly does business in this judicial district and HTC has a registered agent for service in

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

Virginia.  In addition, HTC's unfair and anticompetitive conduct and its wrongful attempt to

extort Apple by excluding its products, described herein, have affected and are affecting

interstate and foreign commerce, including commerce in Virginia and in this District.

11.      Venue is proper in this Court under 19 U.S.C. § 1337(c), the Clayton Act, 15

U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and 1391(c).  Further, ADC's and HTC's unfair

and unlawful conduct with respect to the anticompetitive and wrongful acts at issue has had and

will have harmful effects in Virginia and in this District.  Moreover, HTC is a corporation and

may be found and transacts business in this District, as shown by the facts its products are

distributed, marketed and sold here, it is registered to do business in Virginia, and it has a

registered agent in Virginia, National Registered Agents Inc., located at 526 King St. Ste. 423,

Alexandria, Virginia 22314.

## BACKGROUND

### Standards Setting Organizations (SSOs)

12.      With the goal of achieving interoperability among cellular mobile devices and

cellular networks, handset manufacturers, chipset manufacturers, carriers, and others, participate

in the development of industry technical standards that establish precise specifications for the

essential components of the technology.  Once those standards are established, competing

manufacturers and competing carriers can offer their own products and services that are

compliant with the standards.  A consumer device cannot connect to or operate on a network

unless it is compliant with the industry standards for that network.

13.      Conversely, agreement on a product standard is an agreement not to

manufacture or sell products unless they comply with the standard.  Open standards increase

competition in telecommunications markets by allowing products and services from unrelated

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

competitors to be compatible and operate seamlessly in a telecommunications network.   An

agreement not to sell a product violates the antitrust laws when the agreement would be an

unreasonable restraint on technology or product markets, when it unreasonably restrains

competition in a market by excluding imports of products into the United States, or when the

group's vote is used to unfairly exercise the monopoly power resulting from the lack of

competing alternatives to the standard.  Those who participate in standard setting have a duty to

protect access to the standard so an unreasonable restraint on trade that harms competition in one

or more markets does not occur, markets are not harmed by illegal action that excludes products

from being imported to compete in U.S. markets, or allow for unfair exploitation of the

monopoly resulting from the group vote.  This duty exists independently of any rules of any

organization. The FTC has recently commented to the ITC in another investigation that exclusion

of products from U.S. markets based on their compliance with industry standards harms

competition in those markets.  Likewise, the FTC has enforced the duty to disclose and the duty

to comply with licensing obligations from SSOs to avoid or redress harm to competition in the

markets defined by standards.  Members of SSOs may not misrepresent their intentions to the

SSOs and other members by misrepresentation or misleading omission as to what they allege are

blocking patents, nor can they conspire with another or otherwise attempt to extort value from

users of the standard leveraging blocking patents, nor exclude products that implement standards

from markets.

14.     There are a number of benefits to standardization.  Technical standards, such

as those for mobile wireless technology, have the potential to encourage innovation and promote

competition among telecommunications equipment suppliers and network providers in the

wireless telecommunications industry.  They play a crucial role in the development of wireless

REDACTED VERSION
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

telecommunications technologies.  Product designers and manufacturers are more willing to invest heavily in the development of handsets or component parts knowing that their products will operate effectively within the carrier networks and be compatible with other products from third parties, as long as their products are compliant with the published technical standard.

15.     Costs for both suppliers and purchasers are also reduced because of standards development.  For suppliers, standardization generally reduces the need to develop products to a particular purchaser's specifications.  As such, manufacturing volumes increase and per unit costs decrease because a single product may be sold to numerous purchasers and distributed on a wide basis.  Purchasers benefit from increased price competition among suppliers.

16.     In order to avoid harm to competition that would violate the antitrust laws, and to guide their members in fair play and promotion of the goals of standard-setting, nearly all standard-setting organizations have adopted intellectual property rights policies of one form or another ("IPR policies").  These IPR policies do not replace antitrust regulation, but are intended to assist the SSO and its members from running afoul of such regulation.  These IPRs also help to give effect to the expectations among those who collaborate in the ongoing standardization process.  By contract, and by representations to the organization, each other, the market and the public, members of an SSO must follow these rules and comply with antitrust regulation regardless of its rules.  Members of SSOs and others in the industry are expected to and do rely on these rules and the obligations participants in standard-setting voluntarily assume.  These rules are an aid to compliance for all involved in the standard process.  Following the rules of an SSO is not a defense to an antitrust claim, where the conduct is otherwise unlawful.

17.     Such policies set forth requirements that concern, *inter alia*, disclosure of IPR that its owner may assert covers any portion of the specifications of the standard in development,

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

as well as continuing work that relates to or builds on past standards.  It is common practice in

SSOs for the chairman or moderator of each working group, voting assembly or other meeting on

development or adoption of a standard to remind those in attendance at the beginning of each

meeting that they are required to disclose intellectual property that they might allege is essential

to the standard in development or proposed for adoption.  Because standards are constantly

evolving, this duty applies to participants in the process and members of SSOs both before and

after adoption of a standard.  This obligation is based on what a participant might allege blocks

or interferes with implementation of a standard, regardless of whether any court or other

authority has adjudicated the scope, validity or enforceability of the patent.

18.     To ensure that those participating in standards development can properly

evaluate technical proposals with knowledge of potential hurdles or problems in implementation

of the standard in their products from patent infringement claims, the prompt disclosure of

purportedly essential IPR becomes absolutely critical.  The pro-competitive effects of standard-

setting that justifies these restraints on product specifications are frustrated if patent lawsuits can

be used to delay distribution, increase costs, exclude or penalize manufacturers for compliance

with the standard, regardless of how those lawsuits are later decided.  Participants in SSOs

therefore have a duty to timely disclose "essential IP" during the standards setting process and

thereafter to avoid unreasonable restraints on competition in the relevant product markets.

Intentional failure to identify alleged blocking patents is a fraud upon the SSO, its members, and

the industry that depends on open standards.

19.     Selection of a product specification as an industry standard by a vote of the

industry grants an economic monopoly in the "input" technology market to a patent owner whose

patent covers all or part of the standard.  In this circumstance, antitrust regulation prohibits unfair

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

exploitation of the group vote by a patent owner to disrupt or delay distribution, impose

additional costs on or exclude competitor's products from the market with assertion of a patent

that the owner has not disclosed prior to the group vote, and in subsequent meetings and votes on

evolving standards building on the group's past work.  Over time in the telecommunications

industry, standards build on and evolve from previously adopted standards for incremental

changes to, improvements of or expansion of networks.  The result is that the longer a standard is

left undisturbed, the more embedded it becomes in the industry.  Moreover, conspiring with

others or attempting to extort value based on the group's selection of the standard by assertion of

an alleged blocking patent is likewise unlawful.

20.      The obligation to disclose essential IPR arises from a number of different

independent sources.  First, antitrust and competition laws only permit market participants to

collaborate on a standard, notwithstanding the elimination of competing technologies, so long as

the process and result are open, fair, and promotes competition in the product and technology

markets for which the standard is adopted.  Second, expectations by participants that no patent

owner would withhold allegations that it has or might assert one or more of its patents could be

used to block or interfere with implementation of the standard, or as additional work is done to

build upon standards already adopted.  Third, rules of SSOs that require participants in working

groups and those who are part of their organizations to give notice of patents they allege  would

be necessary to implement a standard or one that has been adopted.

### 3GPP and its SSO Organizational Partners

21.      One such SSO in the telecommunications industry is the 3rd Generation

Partnership Project ("3GPP"), which is an umbrella organization comprised of six

telecommunications standards bodies (called "organizational partners"), including European

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

Telecommunications Standards Institute ("ETSI") and Alliance for Telecommunications Industry

Solutions ("ATIS").  Recognized as an official European Standards Organization by the

European Union, ETSI produces "globally applicable standards for Information &

Communications Technologies including fixed, mobile, radio, broadcast, internet, aeronautical

and other areas."   By virtue of its membership in one of the 3GPP organizational partners, a

member company participates in 3GPP.  The same is true for ATIS, except ATIS is based in

Washington, D.C., and its membership focuses more on entities doing business in the United

States having interest in telecommunications standards.

22.     The organizational partners of 3GPP have agreed that their IPR policies are to

be followed by their respective members.  And, separately, Article 55 of the 3GPP Technical

Working Procedures specifies that each Individual Member declare "at the earliest opportunity,

any IPR which they believe to be essential, or potentially essential, to any work ongoing within

3GPP." This encompasses standards proposed or in development that build on (and further

embed) past standards.  Thus, participants in 3GPP are contractually bound by the IPR disclosure

obligations of 3GPP and the policies of the particular organizational partner(s) in which such

participants are members.

23.     With regard to ETSI, the relevant provision of ETSI's IPR policy concerning

disclosure of IPRs provides:

> 4.1 Subject to Clause 4.2 below, each MEMBER shall use its reasonable
> endeavours, in particular during the development of a STANDARD or
> TECHNICAL SPECIFICATION where it participates, to inform ETSI of
> ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting
> a technical proposal for a STANDARD or TECHNICAL SPECIFICATION
> shall, on a bona fide basis, ***draw the attention of ETSI to any of that
> MEMBER's IPR which might be ESSENTIAL*** if that proposal is adopted.

ETSI Rules of Procedure, 29 March 2007, Section 4.1.  (Emphasis added).

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

Moreover, ETSI Rules of Procedure define "ESSENTIAL" as follows:

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

*Id.*, Section 15.6.

Members of ETSI are obligated to abide by these disclosure requirements. Thus, members and participants in 3GPP and ETSI are required to disclose intellectual property (including patents and patent applications) owned by them which they believe are or are likely to become essential, or might be essential, to the work relating to the development of the standard under consideration, i.e., the LTE standard (hereinafter "Essential IPR").

24. In developing standards, such as the LTE standard, 3GPP and those companies that participate in the working groups and industry vote, directly and/or through organizations which make up 3GPP, try to select the most appropriate technology to provide each individual function within the standard. The decisions are made based on technical and commercial merit as well as intellectual property considerations; including whether the proposed technology was covered by disclosed IPR and whether the owner of the IPR might inflate costs, delay or disrupt implementation of the standard. 3GPP standards must be available for implementation by industry without the delay, disruption or undue expense from patent threats or lawsuits. The same is true for standards that would further commit the group and industry to a technology essential to a previously adopted standard. Typically, such standards are for interface

12

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

or interoperability purposes, and neither go to core functionality of a device or its proprietary features.

### ADC's and HTC's Involvement with Standard Setting Organizations

25.     On information and belief, from at least 2000 to through at least 2005, ADC was a participant in the 3GPP standardization process through its membership in at least ETSI. ADC regularly sent a representative to 3GPP meetings. On information and belief, ADC continued as a member of ETSI even after its representatives ceased personal participation in 3GPP meetings. On information and belief, those individuals that participated in meetings included Tim Lock and Samuel Sida, who were employees of ADC Telecommunications Ltd., a subsidiary of ADC located in the United Kingdom. On information and belief, those ADC employees participated in 3GPP working group meetings, through ADC's membership in at least ETSI.

26.     On information and belief, ADC and later HTC, as members of ETSI, have participated in 3GPP standard-setting working groups in formulating LTE standards. On information and belief, HTC began participating as a member of 3GPP in August 2008. HTC continues to participate in 3GPP meetings on continued standardization relevant to LTE. Early meetings in this process evaluated competing technologies for use in the standards, and sought to choose from among several options that could serve the functions to be standardized. On information and belief, ADC participated in meetings of working groups that specifically discussed technology for use in standards that later became known as the "36 Series." The "36 Series" is an LTE standard that currently includes, among other requirements, TS 36.100, 101, 211, 212, 213, 221, 300, 321, 331 and 523, and relate to TR 25.892 (hereinafter individually and collectively referred to as the "LTE Standard"). Work on new LTE standards continues to

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

evolve from this earlier work.  The working group originating work on the LTE Standard was

setting the direction for the future development of standards for LTE compliant networks and

products, which has continued and continues through the present time.  On information and

belief, had ADC disclosed its IPR either at the inception of this work when it actively attended

meetings, or any time afterward when it was aware that the standards were under consideration,

then either the working group, 3GPP, and ETSI or any or all of them, could have considered

alternatives rather than the product specification chosen, or developed or modified the

specifications to avoid the IPR now alleged to be essential, or ADC would have been required to

commit to license on FRAND terms.

27.     On information and belief, despite being an active member of 3GPP and ETSI

at the time the standards for LTE were being developed, ADC failed to disclose the '219 and the

'944 patents, or the patent applications that resulted in those patents, or any of the patents and

patent applications or other IPR related to the '219 and '944 patents, at any time, even though its

representatives in the process believed the '219 and '944 patents, or the related patents and

patent applications, were Essential IPR and covered or may have covered all or part of the

standards in development.

28.     On information and belief, working groups began working on aspects of the

LTE Standard at least since May 2005.  The 36 Series LTE Standard, which implements

technologies that are purportedly covered by the '219 and '944 patents, was frozen or "locked

in" by no later than December 2008.  On information and belief, ADC knew the LTE Standard

was in development even after it no longer actively attended meetings, and believed its IPR

would block implementation of the standard, as the standard was brought to completion.  Since

then and to the present day, working groups continue to work on enhancements, which build on

14

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

the previously adopted standard. HTC continues to participate in this work, but has not disclosed the '219 and '944 patents (or any of the related patents or patent applications) even though it now effectively alleges in this Investigation they are each essential to implementation of the LTE Standard.

29. Based on internal HTC documents and discovery obtained in the present Investigation,  Ultimately, ADC took no affirmative steps in response and continued to remain silent as to the existence of the '219 and '944 patents or their applications, or related patents and patent applications or IPRs, to the SSOs, notwithstanding ADC's knowledge of the work on the LTE standard then in progress.

30. Since commencing its participation in 3GPP and ETSI, HTC has disclosed certain IPR as Essential IPR to 3GPP and ETSI. For example, on March 22, 2012, HTC submitted to ETSI an "IPR Information Statement and Licensing Declaration" disclosing a number of patent publications as Essential IPR for the LTE Series 36 standards. This disclosure omitted the previously acquired '219 and '944 patents, Since having acquired the '219 and '944 patents from ADC in April 2011, HTC has failed to disclose those purportedly essential

REDACTED VERSION

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

patents to 3GPP and ETSI in any filing or working group meeting. HTC continues to participate in 3GPP working groups and other groups, including those that deal with evolution and expansion of standards relevant to LTE compliant networks and products.

### ADC's and HTC's Concerted Effort To Target Apple With Blocking Patents

31. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ Indeed, it was around this time that HTC was embroiled in the 710 Investigation brought by Apple. █████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

32. In response to HTC's email for more information, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Likewise, the statements show a plan to unfairly exploit the monopoly over this technology granted by the group vote by selling this portfolio as a weapon that could be used to disrupt or exclude competitors from the technology market and their products from the downstream product markets, targeting Apple. The ADC patents were being marketed to exclude, among other things, products manufactured in foreign countries from importation into the United States (and distribution in each state including Virginia). These

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

patents were being offered to HTC to attempt to extort a license from Apple to its patents on

unique proprietary features that were not related to standards.

33. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

34.     Both the '219 and '944 were specifically referenced during the discussions

between ADC and HTC.  For example, in presentation materials provided to HTC, ADC states:

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████

In that same presentation, █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

35.     In another presentation, ███████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

36.     In another presentation, the question was asked ███████████████

███████████████    That same presentation noted ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████

██     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

HTC clearly shared ADC's understanding that the patent portfolio's value was in exploiting the

monopoly stemming from selection of the technology purportedly claimed in the ADC patents

for incorporation into the LTE standard.  The ADC patents at issue in this Investigation are the

bulwark of this portfolio and were thought by both HTC and ADC to be essential to the LTE

Standard.  Further, HTC and ADC formulated their transaction on the basis that HTC could and

would use these patents to exclude competitors from the "input" technology market asserted to

be covered by the patents, the downstream product markets, and to prevent products made in

foreign countries from being imported into the United States, by virtue of adoption and evolution

of LTE Standards.  Despite having this understanding, HTC never disclosed the IPR to ETSI or

3GPP even as it continued to participate in the work on the LTE standard.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

38.    In a "Patent Purchase Agreement" ██████████████ HTC agreed to pay

ADC a total of $75 million for the purchase of the ADC patent portfolio.  In the agreement,

despite its involvement in and obligations to 3GPP and member organizations, and the various

statements it made to HTC regarding the essentiality of the ADC patents, ADC made the

following representation and warranty:

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

On information and belief, ADC and HTC knew that this representation was false, and

knew that both entities had obligations to disclose the existence of the ADC patents to 3GPP and

ETSI in light of the belief that such IPR was essential to the LTE standards, under those

organizations rules, antitrust regulation, and in accordance with expectations of industry

members who relied on notice and fair play.  ██████████████████████

████████████████████████████████████████████ when in fact

the purchase price in the agreement is $75 million.  The timing of the transaction, closing after

one year of negotiation, during the prior ITC investigation initiated by Apple, shows that the

value in this transactions was to extort a license from Apple to avoid the exclusion of HTC's

infringing products from the U.S.  This was done to conceal the transaction from U.S. antitrust

regulators with a valuation below one threshold that would require notice under the Hart-Scott-

Rodino Act, 15 U.S.C. 18a.  These acts by HTC and ADC show they deliberately conspired to

violate the antitrust laws.  These acts also show they conspired to extort Apple into granting

HTC a license to Apple's patents, intentionally committed fraud, breached their commitments to SSOs, their members, and violated all notions of fair play and honest dealing in the industry.

39. In April 2011, it was reported that HTC purchased the ADC portfolio containing 82 patents, including the '219 and '944 patents, for $75 million. Indeed, in a press release, HTC stated that "it has bought a batch of 4G patents from USA based ADC Telecommunications." ███████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

### ADC and its Successor-In-Interest HTC Understand
### the Obligation to Disclose Essential Patents

40. HTC claims to be the current owner of ADC's patents, including the '219 and '944 patents at issue. As the purported assignee, ADC's misconduct before 3GPP and at least ETSI, including, but not limited to, ADC's breach of its duty to disclose Essential IPR, including the '219 and '944 patents, to 3GPP and at least ETSI, is imputed to HTC. This is highlighted and reinforced by the fact that HTC purchased the patents with notice of ADC's past conduct and for the purpose of exploiting that conduct. HTC's and ADC's conspiracy to hide the transaction from antitrust regulators is additional evidence that they knowingly violated the antitrust laws and other laws.

41. Independent of the imputation of ADC's misconduct before the SSOs to HTC, HTC maintains a continuing duty to disclose Essential IPR because HTC is currently a participating member of 3GPP and ETSI. Indeed, HTC is fully aware of its duty. This is evident

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

from HTC's selective disclosure of certain IPR that it considers to be essential. For example, on or about September 8, 2011, HTC declared what it deemed to be essential patents for practice of the LTE Standard with respect to some IPR, *see, e.g.,* ███████████ Likewise, HTC made an IPR disclosure to ETSI on March 22, 2012. HTC, however, specifically and purposefully continues to withhold the disclosure of the '219 and '944 patents. Notably, disclosure of the '219 and '944 patents in the same form as HTC's other disclosures would require HTC to make a public, written commitment to license those patents on FRAND terms to anyone for implementation of the standard.

42.     Remarkably, while HTC continues to violate its obligation to disclose under antitrust regulation, expectations of participants in the standards process and the industry, and rules of the SSOs, by withholding disclosure of the '219 and '944 patents in the LTE standardization process, HTC continues to receive the benefits of being a member of SSOs, for example, by submitting technical proposals for consideration by the working groups. Indeed, in March 2012 in connection with a working group meeting in Jeju, Korea, HTC submitted for discussion a technical proposal that relates directly to the ADC patent portfolio, including at least the '219 patent. *See, e.g.,* ███████████

43.     In the present case, HTC contends that Apple's accused products infringe the '219 and '944 patents because they practice the LTE standard. By definition (as set forth in the ETSI Rules of Procedure), the '219 and '944 patents are believed by HTC to be essential because, as HTC effectively contends, it would not be possible to operate the accused products – which comply with the LTE standard – without infringing that IPR.

44.     Despite its apparent practice of disclosing some IPRs that are purportedly essential to the LTE Standard, HTC continues to conceal the '219 and '944 patents from 3GPP

21

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

and/or ETSI and continues to evade any obligation to license those patents under FRAND terms.
But for HTC's deliberate, deceptive, and anticompetitive misconduct, members of the industry,
such as Apple, would have been given the opportunity to license the purportedly essential '219
and '944 patents on FRAND terms.  Instead, HTC has avoided its obligations to license under
FRAND terms, thereby causing harm to Apple, the mobile wireless communications industry,
and consumers.  To date, HTC has not offered any terms to Apple for the technology purportedly
covered by the '219 and '944 patents, but instead seeks to enjoin Apple from importing certain
of its products that HTC alleges practice the technologies covered by the '219 and '944 patents.

45.     Both ADC and HTC's unlawful conduct enable them to take advantage of the
exploitive conduct that SSOs seek to avoid by having in place clear policies, such as the duty to
disclose essential IPR and commit to licensing under FRAND terms, to prevent such
exploitation, and to avoid having the SSO or its processes used to violate antitrust regulation.

**HTC Has Violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2, 15 U.S.C. § 8 and
the Virginia Antitrust Act, Virginia Code 59.1-9.5 and 9.6**

46.     HTC's and ADC's unlawful conduct has had, and will continue to have, a
substantial anticompetitive effect on the Input Technologies Markets..

47.     As members of at least ETSI, ADC and later HTC participated in 3GPP
standard-setting working groups in formulating LTE Standards and regardless of participation in
working groups had commitments during the time they participate or participated as members of
ETSI, to disclose IPR alleged essential to standards.  Indeed, this is the conduct expected by the
industry as a whole and required by antitrust regulation.  Early meetings in this process evaluated
competing technologies for use in the standards, and sought to choose from among several
options that could serve the functions to be standardized.   On information and belief, ADC

22

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

participated in meetings of working groups that specifically discussed standards that later became the LTE Standards.

48.     On information and belief, in early meetings, ADC recognized that patents and patents issuing from pending patent applications might be asserted against one of the technologies being considered by the working group.  ADC recognized from its participation in working group meetings that the technology it believed was subject to its patents and patent applications appeared to be emerging as the one preferred by the group.  At each working group meeting in which ADC participated, the Chairman of the meeting read a policy statement that required disclosure of intellectual property that any participant thought was necessarily implicated by the technical matters being considered in the standards process.  ADC understood and believed that the working group's efforts in this area had settled on technologies subject to ADC's intellectual property rights, but did not disclose their beliefs or the patents, patent applications or other intellectual property. ███████████████████████████████████
██████████████████ but ADC took no action.  Had ADC done so, the group could have focused on other alternatives, worked on modifications then and later to avoid ADC's IPR, or ADC would have had to commit to license on FRAND terms.

49.     ADC knew that it had disclosure obligations by contract, bylaws, industry expectations, and also as a result of its own collaboration with its competitors under antitrust law, in choosing a technology that would eliminate competing technologies by group vote.  On information and belief, ADC participated in and was a member of ETSI in 2005 which set the course for adoption of the LTE Standard.  ADC continued to be bound by ETSI policy and bylaws even after it stopped sending its employees to working group meetings.  Further, ADC remained knowledgeable about the progress of the working group but deliberately chose to

23

REDACTED VERSION
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

remain silent and let the working group choose product specifications ADC believed it could block with its patents.

50. Because LTE specifies a set of distinct technologies to perform the various functions within the standards, once a standard was adopted, for those functions included in each standard, there were (by definition) no substitutes for the standardized technologies that perform each function. Further and continuing work on and evolution of LTE Standard builds on and further embeds prior standards in LTE compliant networks and products.

51. Once 3GPP, including ETSI participants, selected a single technology to perform a particular function needed to practice the standard, any alternative technologies that had been capable of performing that function were no longer viable alternatives for Apple and other parties seeking to implement LTE Standards (including modifications to the selected technology). Thus, the selection of a particular technology during the standard-setting process reduced to a single option the technology to perform each function included in the standard. Parties implementing the standard, such as Apple, are "locked-in" to the technology, just as the industry is locked into the technology's evolutionary path as networks compliant with the standard are installed.

52. If a technology selected for inclusion in the standard is protected by patents or other IPR, the owner controls the supply of that particular technological input for the standard. This is true for each function comprising the standard for which patented technology was selected. This control is bestowed by the group's vote to select the technology for the standard, which includes a collaboration of competitors in the technology input and downstream markets. Here, the vote of the group bestowed upon patent owners who assert their patents are Essential IPR monopoly power over input technology. The monopoly over each input technology is

REDACTED VERSION
CONTAINS CONFIDENTIAL BUSINESS INFORMATION

especially powerful due to its potential to disrupt downstream product and service markets, and to bar importation of products made in foreign countries from entering the U.S.  The relevant markets in which to assess the anticompetitive effects of ADC and HTC's misconduct include the various markets for technologies that were competing to perform each of the various functions covered by the '219 patent and '944 patent that are now alleged to be essential to the LTE Standards (the "Input Technologies Markets"), as well as the impacted downstream markets for handsets, network hardware, and wireless communication services throughout the world, including the United States and Virginia.

53.



However, both ADC and HTC were at various relevant times members of ETSI, participated in 3GPP, and other industry organizations, and collaborated with their competitors in eliminating competing products and technologies from the market.  As a result of those circumstances, ADC and HTC each had obligations to disclose Essential IPR for the LTE Standard, and to indicate to the group its willingness to license its patents under FRAND terms.

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

54.     Nonetheless, HTC has relied on LTE Standards to contend that Apple's LTE compliant products infringe the '219 and '944 patents, and to exclude Apple's products from being imported into the United States.  Any smartphone, tablet PC or technology that is sold in the United States that sends or receives data over wireless telecommunications networks implementing LTE technology must implement LTE standards to function, including any LTE product Apple imports into the U.S.

55.     The functionality for LTE provided by each Input Technology, therefore, comprises its own relevant market for antitrust purposes, worldwide, in the United States and in Virginia. The downstream markets impacted are those for handsets, tablet PCs, and other mobile devices that consumers use to access or transmit data over LTE compliant networks, the markets for data transmission services by owners of those networks, and the markets for infrastructure equipment for those networks worldwide, in the United States and in Virginia.

56.     LTE is employed throughout the world and alternative technologies competing to be incorporated into the LTE Standard were offered by suppliers from around the world.  ADC's patents would not have given it an economic power over the Input Market but for the group's vote.

57.     The geographic scope of each of the relevant Input Technologies Markets described above is worldwide, with submarkets in the United States and each State, including Virginia.  The Input Technologies as alleged are blocking technologies to importation of products into U.S. markets and distribution into each State, including Virginia.  Impacted market participants and consumers, and harm to competition, has occurred in the United States and in Virginia.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

58.     If HTC in fact has patents covering technologies that have been incorporated

into the relevant standard, it has the power to raise prices and exclude competition with respect

to each of the technologies covered by its patents and incorporated in the relevant standard, as

well as to seek a bar of importation into the U.S.  And it purchased that power from ADC with

not just full knowledge of that, but in fact with both HTC and ADC seeking to exploit ADC's

misconduct in connection with the standard-setting process.  Significantly, HTC compounded

this deliberate conduct – and continues to do so to the present day – by failing to honor its own

independent obligations separate and apart from those of ADC, including a failure to abide by its

own IPR commitments and to disclose Essential IPR.

59.     Barriers to entry into these markets are high because, among other reasons, the

post-standardization lock-in effect means that other technologies are no longer viable substitutes

for the technologies the standard specifies to perform functions included in the standard.  The

lock-in effect is embedded in the enormous investment of resources in construction and

operation of networks as well as investment in products that must operate on those networks.

60.     In addition, by failing to disclose its patents and purposefully attempting to

evade any obligation to license its purportedly Essential IPR, HTC has attempted to place itself

in a position where it is not obligated to offer licenses to others, including Apple, under FRAND

terms.  That is, by purposefully concealing the existence of purportedly Essential IPR, HTC now

claims that it can seek and obtain an exclusion of Apple products from entry into the United

States regardless of whether it has offered a license to Apple under FRAND terms.

61.     By virtue of its misconduct before the SSOs, and its agreement with ADC,

HTC holds market and monopoly power in the Input Technology Markets, assuming that the

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

'219 and '944 patents cover the LTE Standards as asserted by HTC in its contentions, and as marketed by ADC to HTC.

62.     This market and monopoly power only exists by virtue of the 3GPP creation of the LTE Standards and its adoption by ETSI and other industry groups.  ADC exploited the elimination of competing technologies by the group to market the patents to HTC.  HTC is exploiting the group's elimination of competition to exercise monopoly and market power to exclude Apple from the downstream market for smart phones and tablet PCs, or to extort from Apple value for HTC that HTC never would have been able to obtain but for the group's elimination of competing options for the LTE Standards and its purchase of the patents from ADC.  This includes efforts to bar importation of products into the United States.

63.     HTC has conspired with ADC to restrain trade resulting in injury to Apple and consumers.  ADC, and then by its patent purchaser, HTC, wrongfully obtained market and monopoly power in the Input Technologies Markets through exploitation of non-disclosure of purportedly ADC Essential IPR during the standard-setting process and then wrongfully seek to enjoin Apple from selling end products that contain chipsets implementing LTE, notwithstanding ADC's and HTC's participation in 3GPP resulting in or further promulgating LTE Standards. HTC's conduct more broadly has and continues to threaten to unlawfully disrupt, increase costs and exclude rivals from the manufacture and sale of downstream cellular communications devices that implement the LTE Standard and chill competition to develop and sell innovative new LTE compliant products, resulting in increased prices and decreased quality and innovation in downstream product markets and complementary technology markets.

64.     Moreover, HTC and ADC agreed in their purchase agreement for the patents to conceal their transaction from U.S. antitrust regulators by attempting to avoid the filing

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

requirements of 15 U.S.C. § 18a and related regulations in deciding between themselves that the

U.S. patents had a lower value than the purchase price below the HSR threshold, which valuation

would in their plan not require a submission to law enforcement (the purchase price did require a

submission under at least one threshold). This is just one more type of evidence of the intent to

harm competition in the markets and Apple by HTC and ADC.

## Anticompetitive Effects of ADC and HTC's Conduct

65. The foregoing conduct by ADC and HTC has caused and threatens to cause

harm to competition. These anticompetitive effects include each of the following:

(a) ADC deliberately failing to disclose purportedly Essential IPR during the standard-setting process in order to gain market power or a monopoly over certain Input Technologies for what became the LTE Standards, during the time it was a working group member, later while it remained a member of ETSI, and even when it claims it was no longer a participant but continued to remain knowledgeable about the LTE standardization process and progress.

(b) ADC conspiring and combining with HTC to allow HTC to garner sufficient market power, and/or to gain a monopoly in the Input Technologies for the LTE Standard so as to delay, disrupt or eliminate Apple products from competing in the downstream markets and/or to attempt to extort Apple to give up its own valuable, patented technology on unique product features in unrelated technology markets.

(c) HTC's unlawful conduct has or will increase prices and decrease quality and innovation for technologies in Input Technologies Markets. Apple and other consumers of input technologies have been or will be harmed by HTC's conduct by being eliminated from competing and downstream markets, or giving up consideration in other markets, on threat of injunction and marketplace disparagement as a result of ADC's and HTC's illegal conduct.

(d) HTC's conduct has and, unless enjoined, will continue to substantially increase costs associated with the manufacture and sale of downstream of wireless mobile communications devices that are compliant with the LTE Standard and potentially exclude rivals from the manufacture and sales of such devices.

(e) HTC's conduct also threatens to chill innovation and quality competition for products that comply with the LTE Standard. If HTC's conduct is left unchecked, innovators will no longer be able to invest in and bring to market

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

products that comply with the LTE.

(f) HTC and ADC deliberately failing to disclose purportedly Essential IPR during the standard-setting process in order to evade obligations to license Essential IPR under FRAND terms thereby permitting HTC to sue competitors and seek injunctions and exclusion of products from the US market or attempt to extort unfair, unreasonable and discriminatory royalties and license terms from such competitors.

66.     Such harm will continue unless and until the Court issues appropriate injunctive relief against HTC's enforcement of the '219 and '944 patents against LTE standards (and those standards that rely upon them or evolved from them), compensatory damages resulting from harm to competition in the markets impacted as suffered by Apple, treble damages as a penalty against HTC, and attorneys' fees and costs of court.

## COUNTERCLAIMS

### FIRST COUNTERCLAIM
### Breach of Contract – Standards-Related Misconduct

67.     Apple realleges and incorporates herein by reference the allegations in paragraphs 1-66 above.

68.     As a participant of at least ETSI and 3GPP, each of ADC and HTC agreed to participate in those organizations in accordance with the requirements of the respective ETSI and 3GPP IPR policies.  Under those policies, each of ADC and HTC were required to disclose Essential IPR relating to the development of the LTE Standard.

69.     ADC and HTC each individually breached its contractual obligations to at least ETSI and 3GPP by failing to disclose its purportedly Essential IPR including the '219 patent and '944 patent (or applications that became those patents), and related patents and patent applications.  HTC purchased ADC's patent portfolio aware of and seeking to exploit this breach by ADC.  To date, neither ADC nor HTC have disclosed the '219 patent and '944 patent to ETSI

30

REDACTED VERSION

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

or 3GPP, notwithstanding the fact that both ADC and HTC regard those patents as essential to practice the LTE standard.

70.     HTC continues to participate in working groups involved with the development of the LTE standard, but continues to conceal the existence of the '219 patent and '944 patent to ETSI and 3GPP and to evade any obligation to license such patents under FRAND terms.  HTC has made IPR declarations to ETSI since purchase of the patents from ADC but has failed to disclose the '219 and '944 patents in those declarations.

71.     Apple is a direct and intended beneficiary of ETSI and 3GPP rules, ADC's and HTC's contractual obligations to ETSI and 3GPP, and to the members of those organizations as well as designers and sellers of products that implement the LTE standards, including the obligation to disclose Essential IPR relating to the development and maintenance of the LTE Standard.  Apple is also an intended third party beneficiary of ADC's and HTC's contractual obligation to ETSI and 3GPP, including the obligation to disclose Essential IPR related to the development of the LTE Standard.  Apple also reasonably relied on these disclosure obligations in developing, manufacturing and marketing its LTE compliant products.

72.     But for ADC's and/or HTC's non-disclosures, alternative viable technologies would not have been excluded from the relevant Input Technology Market, or modifications to avoid the IPR issues could have been considered, and/or ADC and HTC would have been obligated to offer licenses to the ADC patents under FRAND terms and HTC's request for an exclusion order in the International Trade Commission would have been precluded.

73.     As a result of ADC's and HTC's contractual breaches, Apple has been injured, including its business or property.  Apple has been forced to expend resources resolving this dispute, and has suffered or faces the threat of, in particular, increased costs, lower quality or

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

innovation for Input Technologies, loss of profits, loss of customers and potential customers, loss

of goodwill and product image, uncertainty in business planning, and uncertainty among

customers and potential customers.   Unless the contract is specifically enforced by injunction,

Apple will continue to be harmed and further injured.

## SECOND COUNTERCLAIM
### Fraud and Conspiracy to Commit Fraud

74.     Apple realleges and incorporates herein by reference the allegations in

paragraphs 67-73 above.  On information and belief as supported by publicly available

documents and internal HTC documents, Apple alleges the following with respect to its fraud

and conspiracy to commit fraud claims.

75.     ADC made misrepresentations in the form of material omissions to the SSOs,

i.e., by failing to disclose Essential IPR including the existence of the '219 and '944 patents, or

the applications from which those patents issued or related patents and applications directed to

the same subject matter, knowing that those patents and applications qualified as Essential IPR

under the Rules and Procedures of 3GPP and ETSI.

76.     ADC knew the falsity of its representation that it did not own any Essential

IPR and deliberately continued to withhold this information throughout the time it owned

the '219 and '944 patents.  This is at least fraud by omission where there is a duty to speak.  This

is shown by

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

77.     ADC made the misrepresentation by omission with the intent to defraud or induce reliance in order for 3GPP to adopt the LTE specifications that implements the technologies covered by the '219 and '944 patents, notwithstanding its duties to disclose and its relationships to 3GPP, ETSI and its members.

78.     3GPP and ETSI and their members, including Apple, justifiably relied on ADC's misrepresentations by omission.  Specifically, 3GPP ultimately adopted an LTE standard that encompassed the technology purportedly covered by the '219 and '944 patents, with the understanding that those technologies were not covered by patents and thus members of the industry would not be forced to license patented technology under terms that did not comply with FRAND conditions.  In turn, Apple and other members of the SSOs and the wireless communications industry justifiably relied on the false notion (created by ADC's misrepresentation) that those aspects of the LTE standard were not covered by patents or IPR and designed, developed, manufactured and marketed LTE-compliant products.

79.     HTC has deliberately continued this course of conduct as to the '219 and '944 patents in its participation in 3GPP and ETSI work on LTE standardization.  HTC also agreed to pay ADC to exploit ADC's past conduct and to continue its fraudulent omissions in the standards process.

80.     Indeed, after acquiring the ADC patents in April 2011, HTC has participated in LTE working groups and made selective disclosures of IPR that it considers to be essential. For example, on or about September 8, 2011, HTC declared what it deemed to be essential patents for practice of the LTE Standard with respect to some IPR, *see, e.g.,* ████████████ ██ and also made such disclosures in March 2012, but specifically and purposefully continues to

REDACTED VERSION
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

omit and/or withhold the disclosure of the '219 and '944 patents to 3GPP and ETSI. This is fraud by omission as well as by misleading representations.

81.     But for ADC and/or HTC's fraudulent actions, alternative viable technologies would not have been excluded from the relevant Input Technology Market and/or ADC and HTC would have been obligated to offer licenses to the ADC patents under FRAND terms and HTC's request for an exclusion order in the International Trade Commission would have been precluded.

82.     As a result of each of ADC's and HTC's fraudulent misrepresentations, and their agreement to exploit this course of conduct, Apple has suffered injury to its business and property and is threatened by the imminent loss of investment, profits, customers and potential customers, and also loss of goodwill and product image. Apple suffers anticompetitive injury as a purchaser in the Input Technologies Markets because reasonable substitutes have been excluded. Because of ADC's fraudulent misrepresentations and omissions, Apple has been forced to expend significant resources. Moreover, Apple also incurred substantial costs in defending against HTC's baseless patent infringement claims. Apple will be further injured unless HTC is enjoined.

**THIRD COUNTERCLAIM**
**Promissory Estoppel**

83.     Apple realleges and incorporates herein by reference the allegations in paragraphs 74-83 above.

84.     By virtue of its duties, commitments and obligations arising out of its membership of 3GPP and ETSI, HTC made clear and definite promises to potential licensees,

including Apple, that it would license essential patents on FRAND terms.  This is also the expectation of the industry.

85.     To date, HTC has not offered any terms or otherwise made specific commitments to license the '219 and '944 patents on FRAND terms, to Apple for the technology purportedly covered by the '219 and '944 patents, which HTC alleges is implemented by the Apple's accused products.

86.     The intended purpose of HTC's promises was to induce continued reliance by Apple, ETSI, 3GPP and others on LTE standards, to continue work on further standardization of LTE, and to continue to design, manufacture, and market LTE compliant products.  HTC knew or should have reasonably expected that these promises would induce sellers of mobile wireless devices, like Apple, to invest in and develop products compliant with the LTE standard.

87.     Apple made substantial investments in developing and marketing its products and services in reliance on HTC's promises, as described above, including making its products and services compliant with the LTE standard.

88.     HTC is estopped from reneging on these promises to ETSI, its members, designers, and sellers of products implementing the LTE standard, under the doctrine of promissory estoppel.

89.     Apple has been harmed as a result of its reasonable reliance on HTC's promises.  Apple has been forced to expend resources resolving this dispute, including defending claims against it for patent infringement and efforts to enjoin its products notwithstanding HTC's promises to license essential patents under FRAND terms, and is threatened by the loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

90.     Apple invokes the Court's equitable powers to address this cause of action.

Apple requests that the Court find that HTC's standards-related misconduct recited herein

renders unenforceable or otherwise bars HTC's purported standards-essential patents from being

asserted against the LTE standards, i.e., the '219 and '944 patents.  Apple's damages, if it were

excluded from these markets, include not only its lost investments and profits, but loss of market

share and future opportunities, goodwill, and value to its brand that are not readily measurable or

adequately compensable in money damages.

### FOURTH COUNTERCLAIM
### Conspiracy Under § 1 of Sherman Act

91.     Apple realleges and incorporates herein by reference the allegations in

paragraphs 84-90 above.

92.     On information and belief as supported by publicly available documents and

internal HTC documents, ADC and HTC agreed, conspired, combined to use the market power

over the Input Technology Market in the United States to unreasonably restrain trade in that

market, which threatens to harm competition and harmed competition, and as a result of the

illegal conduct, harmed and threatens harm to competition.  ADC and HTC conspired to

unreasonably restrain trade in the Input Technology Market and downstream product markets by

excluding Apple as a competitor, excluding its products from these markets, and preventing

importation of its products into the United States, including Virginia.  As a result of harm to

competition in these markets, Apple has been damaged and is threatened with continued and

increasing damages and loss of market share and other injuries not quantifiable as damages.

93.     ADC and HTC have also agreed, conspired and combined to place

unreasonable restraints on trade in the downstream product markets in the United States, and

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

Virginia, for handsets compliant with LTE standards and tablet PC's compliant with LTE standards, which threaten to harm and have harmed competition in those markets. ADC and HTC have conspired to unreasonably restrain competition in these markets by preventing Apple from importing its products into the United States. As a result of harm to competition in these markets, Apple has been damaged and is threatened with continued and increasing damages and loss of market share and other injuries not quantifiable as damages.

94. HTC must be enjoined from further harming competition in the markets, and Apple is entitled to relief pursuant to the Clayton Act, 15 U.S.C. Section 15.

**FIFTH COUNTERCLAIM**
**Violation of § 2 of the Sherman Act**

95. Apple realleges and incorporates herein by reference the allegations in paragraphs 91-94 above.

96. On information and belief as supported by publicly available documents and internal HTC documents, HTC and ADC have unlawfully and unfairly, and have conspired to unlawfully and unfairly, exploit the monopolized relevant Input Technology Markets alleged to be covered by the '219 and '944 patents by deliberately and deceptively failing to disclose purportedly Essential IPR that ADC and HTC knew at all relevant times, and HTC has since asserted, covers essential elements of the standard and continuing standardization of the LTE Standard. HTC has undertaken this cumulative course of misconduct with the intent to unfairly and illegally exploit its monopolies of the relevant Input Technologies Markets and attempt to monopolize developing LTE Input Technology markets. HTC's actions to attempt to monopolize, unfairly exploit its monopoly, and to conspire with ADC to attempt to monopolize and unfairly exploit monopolies in the relevant markets, are unlawful.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

97.     Had ADC and HTC properly disclosed the '219 and '944 patents, 3GPP would have decided to standardize an alternative technology to perform the relevant function and also sought solutions for future LTE standards that are open to the industry.  Alternatively, 3GPP would have continued to leave the relevant function out of the LTE standard, in which case implementers would have been free to choose various alternative technologies to perform that function and 3GPP would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of the standard.  Had ADC and HTC properly disclosed the '219 and '944 patents, ADC and HTC would have been obligated to offer licenses to the '219 and '944 patents under FRAND terms and would have been precluded from seeking injunctive relief against Apple and others or from attempting to extort value from Apple and others for licenses.  ADC and HTC would not be able to unfairly exploit these monopolies.

98.     As a result of ADC and HTC's misconduct, HTC achieved monopoly power through anti-competitive and/or exclusionary conduct, as opposed to growth or development as a consequence of a superior product, business acumen, or historic accident.

99.     As a direct and proximate result of ADC and then HTC's agreement to allow HTC to monopolize the Input Technologies Market, and to harm competition in other markets, as well as harm relevant markets by excluding Apple products from importation into the United States, Apple has suffered injury to its business and property and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.  Apple suffers anticompetitive injury as a purchaser in the Input Technologies Markets because reasonable substitutes have been excluded and the ADC patents are now being used in ways contrary to FRAND commitments including HTC's efforts to exclude Apple products from

REDACTED VERSION
**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**

entry into the United States through an ITC exclusion order. Because ADC and HTC wrongfully obtained and then abused this monopoly power, Apple has been forced to expend significant resources. Moreover, Apple also incurred substantial costs in defending against HTC's baseless patent infringement claims. Harm to the markets will continue and be exacerbated unless HTC is enjoined, and Apple is entitled to relief pursuant to the Clayton Act, 15 U.S.C. Section 15.

## SIXTH COUNTERCLAIM
### Violation of 15 U.S.C. § 8

100.     Apple realleges and incorporates herein by reference the allegations in paragraphs 95-99 above.

101.     HTC and ADC have conspired to exclude Apple's products from importation into the United States for the markets for handsets compliant with LTE standards and tablet PCs compliant with LTE standards, which will unreasonably restrain trade in the U.S. markets for those products, harm competition in those markets, and Apple will be injured by that harm to competition in those markets unless HTC is stopped from implementing its plan.

102.     HTC must be enjoined from its conduct to prevent further harm to competition in the markets, and Apple is entitled to relief pursuant to the Clayton Act, 15 U.S.C. Section 15.

## SEVENTH COUNTERCLAIM
### Virginia Antitrust Law

103.     Apple realleges and incorporates herein by reference the allegations in paragraphs 100-102 above.

104.     HTC's and ADC's conduct that violates Sherman Act Section 1, harms the markets for Input Technologies and downstream technology and product markets in Virginia and threatens to harm those markets, as a result of which Apple is harmed and will be further harmed. HTC's own conduct, as well as its conduct in concert with ADC, violates Sherman Act

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

Section 2, is an unfair and illegal exploitation of a monopoly of the Input Technology Market, and harms and threatens to harm others doing business in Virginia in that market and downstream technology and product markets.

105.    Apple is entitled to relief under Virginia Antitrust Act 59.1-9.5, 9.6, 9.8, 9.12, cumulative to other remedies as provided by 59.1-9.16.

106.    Unless HTC is enjoined, the markets in Virginia will be further harmed, and Apple will suffer injuries resulting from this conduct and harm to the markets in Virginia.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Apple demands a jury trial on all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Apple respectfully requests the following relief:

1) An injunction barring HTC from enforcing the '219 and '944 patents against Apple or its products;

2) Award damages to redress the harm caused to Apple on account of the unlawful activities of HTC and ADC, including, but not limited to, compensatory damages resulting from harm to competition in the markets impacted as suffered by Apple and treble damages as a penalty against HTC;

3) Declare that the '219 and '944 patents are unenforceable against implementation of the LTE standard; and

4) Award Apple its costs in this action and reasonable attorneys' fees, including fees for defending the action before the ITC; and

REDACTED VERSION
CONTAINS CONFIDENTIAL BUSINESS INFORMATION

5) Award Apple such further, necessary and proper relief as this Court may deem

just and reasonable.

Respectfully submitted,

**FISH & RICHARDSON P.C.**

Dated: June 21, 2012

By: /s/ *Michael J. McKeon*
Michael J. McKeon (VA Bar No. 44341)
Ahmed J. Davis (VA Bar No. 43982)
Steven A. Bowers
Cherylyn Esoy Mizzo
FISH & RICHARDSON P.C.
1425 K Street, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

David J. Healey
FISH & RICHARDSON P.C.
1 Houston Center
1221 McKinney Street
Suite 2800
Houston, TX 77010
Telephone: (713) 654-5300
Facsimile: (713) 652-0109

*Counsel for Respondent/Counterclaimant*
*Apple Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the foregoing document**,**

## **COUNTERCLAIM**

have been served on this 21st day of June, 2012, on the following:

| | |
|---|---|
| Honorable Lisa R. Barton<br>Acting Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C.  20436 | ☐ **Via First Class Mail**<br>☐ **Via Hand Delivery**<br>☐ **Via Federal Express**<br>☒ **Via Electronic Filing** |
| The Honorable Thomas B. Pender<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 317<br>Washington, D.C. 20436<br>rebecca.barbisch@usitc.gov | ☐ **Via First Class Mail**<br>☒ **Via Hand Delivery**<br>☐ **Via Federal Express**<br>☒ **Via Electronic Mail** |
| R. Whitney Winston, Esq.<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436 | ☐ **Via First Class Mail**<br>☒ **Via Hand Delivery**<br>☐ **Via Federal Express**<br>☒ **Via Electronic Mail** |
| Thomas L. Jarvis, Esq<br>Finnegan, Henderson, Farabow, Garrett &<br>Dunner LLP<br>901 New York Ave, N. W.<br>Washington, DC 20001 | ☐ **Via First Class Mail**<br>☒ **Via Hand Delivery**<br>☐ **Via Federal Express**<br>☒ **Via Electronic Mail** |

_____
Adjoa K. Afful