# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| APPLE, INC., | Civil Action No. 1:12-cv-00686-AJT-JFA |
| Counterclaimant, | |
| v. | Jury Trial Demanded |
| HTC CORPORATION, | |
| Counterclaim Defendant. | |

## MEMORANDUM IN SUPPORT OF
## COUNTERCLAIM DEFENDANT HTC CORPORATION'S MOTION TO DISMISS
## COUNTERCLAIMANT APPLE INC'S COUNTERCLAIMS

Creighton J. Macy (VSB No. 77016)
Susan A. Creighton (*Pro Hac Vice*)
Scott A. Sher (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1700 K. Street, NW Fifth Floor
Washington, DC 20006
Telephone: 202-973-8800
Fax: 202-973-8899
cmacy@wsgr.com
screighton@wsgr.com
ssher@wsgr.com

Colleen Bal (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1 Market Street, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099
cbal@wsgr.com

Jonathan M. Jacobson (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7700
Fax: (212) 999-5899
jjacobson@wsgr.com

Laura P. Masurovsky (VSB No. 32379
Thomas L. Jarvis (*Pro Hac Vice*)
Elizabeth Ferrill (VSB No. 72935)
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 408-4000
Fax: (202) 408-4400
laura.masurovsky@finnegan.com
thomas.jarvis@finnegan.com
elizabeth.ferrill@finnegan.com

Dated: July 25, 2012

*Attorneys for Counterclaim Defendant HTC Corporation*

**CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

    A.    The Parties and Their Ongoing Patent Litigation ................................................. 3

    B.    Apple's Counterclaims in the Present Action ........................................................ 4

ARGUMENT ....................................................................................................................... 7

I.     LEGAL STANDARD ................................................................................................ 7

II.    THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED ........................... 8

    A.    Apple Does Not and Cannot Allege A Contract It Can Enforce Against HTC ...... 9

    B.    Apple Does Not and Cannot Allege Facts Showing a Breach of Contract ........... 12

    C.    Apple Does Not and Cannot Allege That Any Breach by HTC Damaged It ....... 14

III.    THE FRAUD AND CONSPIRACY CLAIMS SHOULD BE DISMISSED .................... 14

    A.    The Only Duty to Speak Alleged by Apple Is Contractual .................................. 15

    B.    Apple Does Not and Cannot Allege the Elements of a Fraud Claim .................... 15

    C.    Apple Does Not and Cannot Allege a Conspiracy to Commit Fraud ................... 17

IV.    THE PROMISSORY ESTOPPEL CLAIM SHOULD BE DISMISSED ........................ 18

    A.    Promissory Estoppel is Not a Cognizable Cause of Action .................................. 18

    B.    Apple Does Not and Cannot Allege the Elements of Promissory Estoppel ......... 18

V.     THE ANTITRUST CLAIMS SHOULD BE DISMISSED ............................................ 20

    A.    The Sherman Act § 1 Claim Should be Dismissed ............................................... 20

    B.    No Violation of Sherman Act § 2 ......................................................................... 27

    C.    No Violation of the Wilson Tariff Act .................................................................. 27

    D.    No Violation of Virginia Antitrust Law ............................................................... 27

    E.    No Antitrust Injury .............................................................................................. 28

CONCLUSION ................................................................................................................... 30

## AUTHORITIES

**CASES**

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496 (6th Cir. 2003) ..................................................... 19

*Apple Inc. v. Samsung Electronics Co*., 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ............... 24

*Apple Inc. v. Samsung Electronics Co.*, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ............. 24

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) ......................................................... 7, 13

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ............................................ 28

*Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290 (Va. 2007) ...................................................... 15

*Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989) ........................................................ 21

*Bank of Montreal v. Signet Bank*, 193 F.3d 818 (4th Cir. 1999) ................................................. 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 7, 8

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006) ................................................................. 8

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................................... 25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ........................................... 28

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984) ..................................... 22

*Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104 (1986) ............................................................... 26

*Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000) ........................................... 17

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998) ................................... 22

Complaint, *United States v. 3D Systems Corp.*, No. 1:01CV01237 (D.D.C. June 6, 2001) ......... 26

*Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618 (4th Cir. 2008) ................................................. 8

*Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368 (Fed. Cir. 2008) .............................. 10

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ........................................................ 27

*Digital Sun v. The Toro Co.*, 2011 WL 1044502 (N.D. Cal. 2011) ............................................. 22

ii

*Envtl. Staffing Acquisition Corp. v. B & R Const. Mgmt., Inc.*, 725 S.E.2d 550 (Va. 2012)........ 11

*Food Lion, Inc. v. SL Nusbaum Ins. Agency, Inc.*, 202 F.3d 223 (4th Cir. 2000)........................ 11

*Foreign Mission Bd. v. Wade*, 409 S.E.2d 144 (Va. 1991)............................................................ 15

*Global Bankcard Servs., Inc. v. Global Merchant Servs., Inc.*, No. 11-0110 IDD, 2011 WL
   2268057 (E.D. Va. June 7, 2011) ........................................................................................... 15

*Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994)..................................... 8

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999)..................................... 17

*Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413 (4th Cir. 2005)...................... 27

*In re Japanese Electronic Products Antitrust Litig.*, 631 F. 2d 1069 (3d Cir. 1980) .................. 27

*In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) ..................................................... 26

*Interface Group v. Mass Port Auth.*, 816 F.2d 9 (1st Cir. 1987) ................................................. 21

*Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864 (Va. 2011)............................................. 15

*Kenny v. Bank of Am., N.A.*, No. 11-120, 2011 WL 6046452 (E.D. Va. Dec. 5, 2011) .............. 18

*Koppers Co. v. American Express Co.*, 689 F. Supp. 1371 (W.D. Pa. 1988)........................ 25, 26

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369 (4th Cir. 2012) ...................... 7

*Microsoft Corp. v. Motorola, Inc.*, No. 10-1823, 2012 WL 627989 (W.D. Wash. Feb. 27, 2012)
   ................................................................................................................................................ 12

*Mongold v. Woods*, 677 S.E.2d 288 (Va. 2009) ......................................................................... 18

*NicSand, Inc. v. 3M*, 507 F.3d 442 (6th Cir. 2007) (en banc)..................................................... 28

*Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088 (9th Cir. 2000) ............................ 27

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).................................................................... 23

*Oksanen v. Page Memorial Hosp.*, 945 F. 2d 696 (4th Cir. 1991) .............................................. 28

*Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176 (4th Cir. 2009).......................................... 8

*Pressure Sys. Int'l. v. Airgo IP, LLC*, No. 08-245, 2010 WL 3430859, (S.D. Tex. Aug. 31, 2010),
   *aff'd*, 465 F. App'x 973 (Fed. Cir. 2012)............................................................................... 10

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003) ........................................................................................... 27

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ........................................................ 22, 24, 27

*Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008).................... 25

*Rollston v. Commonwealth*, 399 S.E.2d 823 (Va. Ct. App. 1991)................................................. 18

*Satellite Television v. Continental Cablevision*, 714 F.2d 351 (4th Cir. 1983) ........................... 28

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .......................................................... 27

*Station # 2, LLC v. Lynch*, 695 S.E.2d 537 (Va. 2010)............................................................... 17

*Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132 (Va. 2009)........................................... 8

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ................................................................................... 21

*Townshend v. Rockwell Int'l Corp.*,  2000 WL 433505 (N.D. Cal. Mar. 28, 2000).............. 23, 24

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008).......... 8

*Van Deusen v. Snead*, 441 S.E.2d 207 (Va. 1994)....................................................................... 14

*Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398 (2004).............................. 27

*WJ Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512 (Va. 1997) ............................................... 18

**ADMINISTRATIVE ACTIONS**

*Aspen Tech.*, 138 F.T.C. 959 (2004) ........................................................................................... 26

*Hologic Inc.*, FTC Consent Docket C-4165 (2006) .................................................................... 26

**STATUTES**

15 U.S.C. § 1 ........................................................................................................................... passim

15 U.S.C. § 18a .............................................................................................................................. 25

15 U.S.C. § 2 ................................................................................................................. 4, 20, 27, 28

19 U.S.C. § 1337(c) ......................................................................................................................... 4

Va. Code. Ann. § 59.1-9.17 .......................................................................................................... 27

**REGULATIONS**

16 C.F.R. § 802.50 (2006) ........................................................................................................ 26

**OTHER AUTHORITIES**

ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (7th ed. 2012)........... 20, 21

BLACK'S LAW DICTIONARY 262 (5th ed. 1979) ........................................................................ 18

Carl Shapiro, *Navigating the Patent Thicket: Cross Licensing, Patent Pools, and Standard Setting*, in INNOVATION POLICY AND THE ECONOMY 119 (Adam Jaffe et al., eds., 2001)........ 29

FED. R. CIV. P. 9(b) ..................................................................................................................... 8

H.R. REP. NO. 94-1371 (1976)................................................................................................. 26

Katherine Strandburg et al., *Panel I: Cross-Licensing and Injunctions—The Interplay Between Big Business, Small Business, and Non-Practicing Inventors*, 19 FORDHAM INTELL. PROP., MEDIA & ENT. L.J. 925 (2009)................................................................................................ 29

Ronald J. Mann, *Do Patents Facilitate Financing in the Software Industry?*, 83 TEX. L. REV. 961 (2005)........................................................................................................................................ 29

William J. Baumol & Janusz A. Ordover, *The Use of Antitrust to Subvert Competition*, 28 J. L. & ECON. 247 (1985).................................................................................................................... 1

**INTRODUCTION**

In 2010, Counterclaimant Apple, Inc. ("Apple") instigated aggressive patent litigation and licensing demands designed to prevent Counterclaim Defendant HTC Corporation ("HTC") from competing in the United States.  HTC, to protect itself and its customers from these aggressive tactics and to preserve its ability to compete in the United States, acquired certain patents in 2011 from a third party, ADC Corporation ("ADC").  HTC sought to use its acquisition of these patents ("the ADC patents") defensively against Apple and other third parties who have and would assert infringement claims against it.  HTC hoped to settle patent disputes on a basis that would permit all parties to continue to compete, allowing consumers to choose their preferred products based on price, features, and quality.  But Apple has filed the present counterclaims ("Counterclaim" or "Claims") against HTC in an attempt to strip HTC of its ability to develop and implement these defensive measures.  Should Apple succeed, U.S. consumers will be denied the benefits of competition from HTC and the ability to use HTC's popular telephone products – an outcome that reduces competition and consumer choice in the very manner the antitrust laws abhor.  In short, Apple's Claims, although clothed as antitrust claims, in fact represent the use of antitrust to subvert competition.  William J. Baumol & Janusz A. Ordover, *The Use of Antitrust to Subvert Competition*, 28 J. L. & ECON. 247 (1985).

The unsupported crux of Apple's Claims is that, prior to HTC's acquisition of the ADC patents, ADC had a supposed obligation to disclose those patents in 2008 to the European Telecommunications Standards Institute ("ETSI") when ETSI was developing a certain standard relating to wireless phone technology ("the Standard").  Based on this allegation, Apple asserts a breach of contract claim against HTC.  Yet it fails to allege the existence of any breached contract between HTC and Apple involving the ADC Patents.  The only contract alleged by

1

Apple to which HTC is a party is an alleged contract between HTC and ETSI – not Apple – and Apple has not alleged facts demonstrating any right to enforce such a contract as a third-party beneficiary.  More important, even if there were a contract and Apple had a right to enforce it, any such contract only required disclosure of "essential" patents "during the development" of the Standard, and HTC did not purchase the patents until *years after* the Standard was developed and adopted and *years after* Apple and the rest of the industry were already "locked in to" the Standard.  HTC could not have had a contractual duty to disclose patents it did not own during the development of the Standard.  Apple's vague assertion of some duty to disclose the patents after acquiring them is without any support in fact or law and is flatly contradicted by the plain language of the alleged contract.  In any event, Apple has not alleged any harm from HTC's alleged failure to disclose patents years after Apple was "locked in to" the Standard.

Apple has not and cannot plead the elements of fraud.  Apple's acknowledgement that it adopted and was locked into the Standard long before HTC could have even theoretically had a duty to disclose the patents (once it acquired them), demonstrates that any failure by HTC to have disclosed the patents would be immaterial to Apple's alleged "injury."  In any event, as a matter of law, fraud claims based solely on a breach of a contractual duty to speak are insufficient to state a claim for fraud, and Apple's fraud claim is premised solely on a supposed duty to disclose arising from a contractual obligation.

The promissory estoppel claim is not cognizable as a matter of law.  Even if it were, Apple's claim that HTC promised to license the patents on fair, reasonable, and nondiscriminatory ("FRAND") terms is unsupported and contradicts the alleged standard setting organization rules upon which Apple's claims are based.

Apple's antitrust claims under Sections 1 and 2 of the Sherman Act, under the Wilson Tariff Act, and under Virginia state law are equally meritless. The Section 1 claim fails because the only agreement alleged by Apple that goes beyond the purely conclusory, the 2011 patent purchase agreement between HTC and ADC, is a procompetitive, arms-length transaction that in no way reduced competition. This agreement did not exclude competitors, did not unlawfully seek to enlarge the scope of the ADC patents, had no effect on the Standard (which had been locked-in years before the purchase), and did not alter Apple's infringement of the patents.

Apple's remaining antitrust claims fail because they are all based on the same core allegations as the Section 1 claim and likewise fail to identify any anticompetitive conduct by HTC that could have had any effect on adoption of the Standard in 2008. They all also suffer from the additional defect that Apple has failed to plead "antitrust injury."

## BACKGROUND

### A.      The Parties and Their Ongoing Patent Litigation

Apple and HTC both manufacture and import popular mobile devices. In March 2010, Apple brought suit against HTC in the International Trade Commission ("ITC") alleging that HTC infringed Apple patents and seeking an exclusion order to bar HTC from importing its products into the United States. Claims ¶ 2. Apple was successful, and, in December 2011, the ITC issued an order precluding HTC from importing certain of its mobile devices into the United States. *Id.*

After Apple sued HTC, HTC was approached by ADC Telecommunications, Inc. ("ADC"), which offered to sell some of its patents to HTC. *Id.* ¶¶ 3, 53. ADC marketed the patents as being infringed by Apple and others and therefore potentially useful to HTC in its attempts to obtain a cross-license from Apple that would allow HTC to continue to import its

mobile devices and compete in the United States.  *Id.*  In April 2010, HTC began negotiations with ADC.  *Id.* ¶ 33.  On April 1, 2011, HTC and ADC entered into a patent purchase agreement. *Id.* ¶ 38.  In the agreement, ADC represented to HTC that "[t]he Patent Portfolio is free of any obligation (such as an obligation to license or an obligation to license under certain terms) based on any participation or membership by [ADC] in, or [ADC] making any affirmative commitment for such obligation to, any standard setting or forming body or organization."  *Id.*

Following its acquisition of the ADC patent portfolio, HTC initiated defensive actions against Apple in the District of Delaware and in the ITC for infringement of two of the patents acquired from ADC, U.S. Patent Nos. 7,672,219 ("the '219 patent") and 7,417,944 ("the '944 patent") (collectively, "the ADC patents").  *Id.* ¶ 1.  At Apple's request, the District of Delaware entered a stay of HTC's patent infringement case pending resolution of the ITC action.[1]

### B.    Apple's Counterclaims in the Present Action

Apple filed the instant Counterclaim against HTC in the ITC action on June 21, 2012 and removed its Counterclaim to this Court the same day pursuant to 19 U.S.C. § 1337(c).  ECF No. 1.  The Counterclaim seeks an injunction to prevent HTC from asserting the ADC patents against Apple, and includes claims for (1) breach of contract; (2) fraud and conspiracy to commit fraud; (3) promissory estoppel; (4) conspiracy under Sherman Act § 1; (5) violation of Sherman Act § 2; (6) violation of the Wilson Tariff Act; and (7) violation of Virginia Antitrust law.

The crux of Apple's Claims is that ADC and HTC should have disclosed the ADC patents to ETSI, the standard setting organization ("SSO") responsible for setting standards for LTE wireless technology before the ETSI adopted the Standard.  Claims ¶ 4.  Specifically, Apple alleges that ADC (and later HTC) were members of ETSI and therefore had a contractual

---

[1]   HTC has concurrently filed a motion to transfer this case to the District of Delaware where HTC's first-filed infringement case on the patents-in-suit is pending.

obligation to disclose, during ETSI's standard-setting process, any patents or other intellectual property rights ("IPRs") that were "essential" to the implementation of the relevant proposed standard being considered by the ETSI for LTE technology. *Id.* ¶ 4.

The relevant ETSI policy Apple invokes provides that "each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion." *Id.* ¶ 23. The same provision further provides that "a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." *Id.* The ETSI rules define "essential" to mean:

> that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.

*Id.*

Apple alleges that ADC participated in ETSI from 2000-2005 and that ETSI began working on developing the Standard around May 2005. *Id.* ¶¶ 25, 28. Apple alleges that ADC did not disclose the ADC patents to ETSI during this time. *Id.* ¶ 27. Three years after ADC stopped participating in ETSI, ETSI finished development of the Standard, and the Standard was "frozen or 'locked in' by no later than December 2008." *Id.* ¶ 28. HTC began participating as a member of ETSI only a few months before the Standard was "locked in," but it did not acquire the patents *until two and a half years after the Standard was locked in*. *Id.* ¶ 26.

Apple alleges that ADC was obligated to disclose the ADC patents to ETSI because it participated for a few months in ETSI after ETSI began initial development of the Standard. *Id.* ¶ 4. Apple claims that if the ADC patents been disclosed to ETSI, ETSI may have asked ADC to

commit to license those patents to others on fair, reasonable, and nondiscriminatory terms, or, if ADC refused to make such a commitment, ETSI may have elected to choose a different standard. *Id.* ¶ 48.

As to HTC (as opposed to ADC), Apple alleges that HTC was obligated to disclose the ADC patents to ETSI, even though (i) HTC did not acquire the ADC patents until April 2011, nearly three years *after* the Standard was "locked in," and (ii) HTC played no role in setting the Standard or in any of the processes leading up to the adoption of the Standard.  Apple's counterclaims, however, cite no ETSI (or other applicable) policy stating or suggesting that anyone who has acquired intellectual property rights *after* the relevant standard has been set has a duty to declare those IPRs to the relevant standards body.  The ETSI policy cited by Apple expressly states that the disclosure requirement applies only "during the development" of a particular standard.  Moreover, Apple has not alleged any harm resulting from HTC's alleged non-disclosure of the patents once it acquired them, years after the Standard was adopted.  Apple concedes that by that time, it had been "locked into" the Standard for years.

Critically, while Apple alleges that the '219 and '944 patents should have been disclosed to ETSI, *it does not allege that the ADC patents are in fact "essential" to the implementation of the Standard*.  Apple merely alleges that the patents are possibly essential because HTC stated in a discovery response (which was subsequently amended and corrected with supplemental responses) that Apple's implementation of the Standard infringed the ADC patents.[2]  *See, e.g.*, *id.* ¶ 4 ("In light of the *purported* essentiality of the '219 and '944 patents, as discussed below, those patents should have been disclosed by HTC and ADC"); *id.* ¶ 58 (alleging only the possibility

---

[2]   HTC requests this Court to take judicial notice of the records in the parties' patent infringement lawsuit pending in the ITC, which records confirm that, contrary to Apple's allegations here, HTC has not alleged and has not yet even determined whether the ADC patents are "essential" to the relevant standard.  *See* Macy Decl. Ex. 1 at 5-6.

that "*[i]f* HTC in fact has patents covering technologies that have been incorporated into the relevant standard" it can preclude use of the standard); *id.* ¶ 69 (alleging HTC breached contract "by failing to disclose its *purportedly* Essential IPR").  Notably, Apple has taken *the opposite position* in the ITC action, arguing that its devices implement the Standard without infringing the ADC patents.  *See, e.g.*, Macy Decl. Ex. 2 at 1, 25-26.  For its part, HTC has expressly not taken a position in the ITC action (or anywhere else) as to whether the ADC patents are in fact essential to implementing the Standard; that is an issue still under investigation.  *See id.*, Ex. 1 at 5-6.

**ARGUMENT**

## I.      LEGAL STANDARD

A Rule 12(b)(6) motion must be granted unless the factual allegations in the complaint are sufficient "to raise a right to relief above the speculative level."  *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369, 377 (4th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 1949.  To state a plausible claim, "[a] 'formulaic recitation of the elements of a cause of action will not do,'" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  While a court will accept as true allegations of fact, it need not accept the truth of conclusory allegations, unwarranted inferences, or legal conclusions cast in the form of factual allegations.  *Id.* at 1949-50.

7

Under Rule 9(b), fraud claims are held to a higher pleading standard.  A "party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  To meet this standard, a plaintiff alleging fraud must explain the "who, what, when, where, and how of the alleged fraud."  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).  "Mere allegations of 'fraud by hindsight' do not satisfy the requirements of Rule 9(b)."  *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994).

In considering a motion to dismiss, the court may consider judicially noticeable information in the public record, documents attached to the complaint, and documents attached to the motion to dismiss that are "integral to the complaint and authentic."  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  This includes documents referenced in the complaint and relied upon by the plaintiff.  *Twombly*, 550 U.S. at 569 n.13; *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

Claims are properly dismissed with prejudice where "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability."  *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).  Here, each of Apple's claims should be dismissed with prejudice because, as discussed below, Apple cannot cure the fundamental deficiencies in its theory of liability that prevent it from stating a claim.[3]

## II.   THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009).  Here, Apple's breach of contract claim is predicated on

---

[3]   Apple has brought its state law counterclaims under Virginia law.  For purposes of this motion only, HTC assumes that Virginia law is applicable to Apple's state law claims.

the allegation that "HTC . . . breached its contractual obligations to at least ETSI and 3GPP by failing to disclose its purportedly Essential IPR."  Claims ¶ 69.[4]  This claim should be dismissed with prejudice because, even if granted leave to amend, Apple does not and cannot allege (1) that there was any contract enforceable by Apple against HTC requiring HTC to disclose the ADC patents during the development of the Standard, before the Standard was "locked in," (2) that any breach of such a contract occurred, or (3) that any breach caused Apple damages.

### A.      Apple Does Not and Cannot Allege a Contract It Can Enforce Against HTC

There are four reasons Apple cannot identify any contract that it can enforce against HTC: First, Apple does not allege that there was any contract that required HTC to disclose the ADC patents before the Standard was "locked in."  Apple admits that it was "locked in to the technology" once the Standard was set, *id.* ¶ 51, and that the Standard "was frozen or 'locked in'" by no later than December 2008. *Id.* ¶ 28.  Accordingly, the only contractual obligation even arguably at issue is one that would have required HTC to take action prior to the "lock-in" in December 2008.  Apple fails, however, to identity any such contractual obligation.

Apple's allegations confirm that HTC cannot have had a contractual obligation to disclose the ADC patents prior to the adoption of the Standard because HTC did not acquire the ADC patents from ADC until *two and a half years after* the Standard was already locked in.  *See id.* ¶ 38 (alleging HTC's purchase of the ADC patents occurred on April 1, 2011); *see also id.* ¶ 53 (alleging ADC did not market the patents to HTC until after Apple had sued HTC).  Indeed,

---

[4]   Apple does not allege any breach of contract resulting from any refusal by HTC to license its patents to Apple on FRAND terms, nor could it.  Pursuant to the ETSI Rules of Procedure 6.1, the obligation to license on FRAND terms does not arise unless the patent owner (1) discloses essential IPR and (2) thereafter voluntarily submits "an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on [FRAND] terms." Macy Decl. Ex. 3 ¶¶ 6.1-6.3. Apple does not allege that HTC has taken either of these steps.  Nor can it because, as discussed above, HTC has not determined whether the patents are, in fact, essential to the Standard, and Apple itself has not alleged that they are.

Apple admits that HTC did not even begin to negotiate potential acquisition of the ADC patents until 18 months after the Standard was locked in.  *See id.* ¶ 33.  Consequently, HTC owed no contractual obligations to anyone – let alone third party Apple – to disclose the ADC patents to ETSI before that standard was locked in.  Apple does not allege that HTC was even aware of the patents during the relevant timeframe. [5]

Second, ADC alone owned the ADC patents prior to lock-in.  Even if ADC had a contractual obligation to disclose its patents to ETSI (which it did not), any purported liability for a breach of that disclosure obligation would not have transferred to HTC when it purchased the ADC patents.  Contractual obligations that do not transfer or assign ownership or license rights are not binding on a subsequent owner of the patent.  *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372-73 (Fed. Cir. 2008); *see also Pressure Sys. Int'l. v. Airgo IP, LLC*, 2010 WL 3430859, at *6 (S.D. Tex. Aug. 31, 2010) ("Agreements about patent rights do not run with the patents; they are also personal."), *aff'd*, 465 F. App'x 973 (Fed. Cir. 2012).

Nor does or could Apple allege that HTC agreed to assume liability for any pre-existing disclosure obligations of ADC.  To the contrary, Apple admits HTC acquired the patents free from any contractual assumption of obligations to any SSO.  *See* Claims ¶ 38 ("The Patent Portfolio is free of any obligation (such as an obligation to license or an obligation to license under certain terms) based on any participation or membership by Seller in, or Seller making any

---

[5]   The Claims might be read to suggest that HTC breached a contract with ETSI by failing to disclose the patents after HTC acquired them in 2011.  *See* Claims ¶ 69.  If that is what Apple means to allege, the contention would contradict the language of the ETSI rules, which require disclose of "essential" patents "during the development" of a standard, not years after the standard has been developed and adopted.  *Id.* ¶ 23.  Moreover, Apple has not alleged that a failure to disclose patents after HTC acquired them would have harmed Apple in any way.  The absence of such an allegation is unsurprising, since, by its own admission, Apple was "locked in to the standard" as of December 2008.  *Id.* ¶ 51.

affirmative commitment for such obligation to, any standard setting or forming body or organization.").

Third, even if Apple could establish that there is or was a contract between HTC and ETSI that would have required HTC to disclose the patents after it acquired them – years after the Standard had been adopted and locked in – Apple does not allege facts sufficient to establish that it was a third-party beneficiary to such contract. A third party cannot enforce a contract unless "the parties to the contract clearly and definitely intended it to confer a benefit upon him. . . . Third-party beneficiaries must be intended beneficiaries of a contract; mere incidental beneficiaries have no right to enforce a contract." *Food Lion, Inc. v. SL Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 229 (4th Cir. 2000). Thus, to be a third-party beneficiary of a contract between HTC and ETSI, Apple would have to allege that ETSI offered consideration with the specific intent to confer a direct benefit on Apple (rather than on ETSI itself) in exchange for HTC's alleged obligations. *Id.* It does not and cannot make that allegation. There is a "'critical difference' between merely being a person or entity that will benefit from an agreement between other parties, and the very different situation in which a contract is entered into with the express purpose of conferring a benefit on a third party." *Envtl. Staffing Acquisition Corp. v. B & R Const. Mgmt., Inc.*, 725 S.E.2d 550, 555 (Va. 2012). Because Apple does not allege facts sufficient to establish that HTC entered into a contract "with the express purpose of conferring a benefit on [Apple]," it has not established itself to be in a position to enforce the alleged contract as a third-party beneficiary.

Fourth, Apple does not allege that it was a member of ETSI or 3GPP. (Nor could it make such an allegation because the membership records confirm that only some of its foreign subsidiaries – and not counterclaimant Apple, Inc. – are members of ETSI and 3GPP. *See*

11

http://webapp.etsi.org/3gppmembership/QueryForm.asp.)  Apple could not therefore have been a

party to or a third-party beneficiary of any contract between HTC and ETSI.  *Cf. Microsoft Corp.*

*v. Motorola, Inc.*, 2012 WL 627989, at *5 (W.D. Wash. Feb. 27, 2012) (finding third-party

beneficiary status where Microsoft itself was a *member* of the standards body).

### B.    Apple Does Not and Cannot Allege Facts Showing a Breach of Contract

Even if Apple had alleged an agreement that it could enforce against HTC concerning

disclosure of the ADC patents prior to the December 2008 adoption of the Standard (which it

does not), Apple has not and cannot allege any *breach* of such contract by HTC.  The contract

term identified by Apple as allegedly breached is Section 4.1 of the ETSI Rules of Procedure:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in
> particular during the development of a STANDARD or TECHNICAL
> SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a
> timely fashion. In particular, a MEMBER submitting a technical proposal for a
> STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw
> the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if
> that proposal is adopted.

Claims ¶ 23 (quoting ETSI Rules of Procedure, 29 March 2007, Section 4.1).  Apple cannot

allege a breach of this provision for several reasons.

First, Apple does not and cannot allege that HTC breached an obligation to disclose

"ESSENTIAL IPRs."  Although the purported "essential" nature of the '219 and '944 patents is

at the heart of Apple's Claims against HTC, Apple never alleges that the patents are in fact

"essential" patents (and will not so allege, since to do so would be detrimental to its patent

defense and contradict its position in the ITC litigation).  Instead, Apple merely alleges that the

patents are possibly essential because HTC stated in a discovery response – a response that was

subsequently amended and superseded by supplemental information obtained in discovery – that

Apple's implementation of the Standard infringed the ADC patents.  *See, e.g.*, *id.* ¶ 4 ("In light of

12

the *purported* essentiality of the '219 and '944 patents, as discussed below, those patents should have been disclosed by HTC and ADC"); *id.* ¶ 58 (alleging only the possibility that "*[i]f* HTC in fact has patents covering technologies that have been incorporated into the relevant standard" it can preclude use of the standard); *id.* ¶ 69 (alleging HTC breached contract "by failing to disclose its *purportedly* Essential IPR"). Unless the patents are essential, there is no duty to disclose them. *See id.* ¶ 23. Thus, Apple must allege that the patents are in fact essential to show a breach of the duty of disclosure. Alleging the mere "possibility" that the patents are essential is insufficient. *Iqbal*, 129 S. Ct. at 1949 (complaint must establish "plausibility" of allegations, not just mere "possibility").

Second, Apple cannot allege that HTC breached an obligation to disclose patents "during the development of a STANDARD or TECHNICAL SPECIFICATION." Claims ¶ 23. Apple's own allegations refute any suggestion that HTC had any disclosure obligations "during the development" of the Standard; Apple admits that the Standard was already "locked in" over two and a half years before HTC acquired the ADC patents. *See Id.* ¶¶ 28, 38.

Third, to the extent the ETSI rules arguably require disclosure of patents that "might be Essential," any such disclosure would only be required if the patent owner was "submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION" and the patent owner's patents "might be Essential" to the proposal it has submitted. *Id.* ¶ 23. Apple does not and cannot allege that HTC breached an obligation to disclose patents that "might be Essential" because Apple does not allege that HTC ever submitted a technical proposal for the Standard before the Standard was locked in in December 2008. In fact, the only proposal submitted by HTC regarding the Standard that Apple alleges was "submitted for discussion" in March 2012 –

seven months after HTC initiated the ITC action against Apple for infringement of the ADC patents. *Id.* ¶ 42.

### C.    Apple Does Not and Cannot Allege That Any Breach by HTC Damaged It

Apple does not and cannot allege any breach of contract by HTC that damaged Apple. For the reasons stated above, Apple has not demonstrated that HTC had any obligation to disclose the ADC patents before the adoption of the Standard.  Thus any damages Apple may have suffered from implementing that standard could not have been caused by HTC's alleged breach of contract.  Further, to the extent Apple alleges that HTC breached a contractual obligation by not disclosing the ADC patents after HTC submitted a technical proposal in March 2012, *see id.* ¶ 42, Apple has not alleged that any such breach caused it any damages.  Indeed, Apple does not allege that the technical proposal HTC submitted was adopted.

## III.    THE FRAUD AND CONSPIRACY CLAIMS SHOULD BE DISMISSED

The fraud and conspiracy to commit fraud claims should be dismissed for failure to state a claim and for failure to plead allegations of fraud with particularity.  "A party pursuing a cause of action for fraud in Virginia must prove by clear and convincing evidence all of the elements of fraud: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance."  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999) (citing *Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994)).  Silence does not constitute a false representation absent a common law duty to speak.  *Id.* at 827.  Apple has not alleged any duty to speak apart from a supposed contractual duty, or any of the other elements of a fraud claim against HTC, or any conspiracy by HTC and ADC to engage in concerted action to commit an unlawful act.

14

**A.      The Only Duty to Speak Alleged by Apple Is Contractual**

There is no cause of action for fraud where the duty to disclose information arises solely from a contractual obligation; the only potential claim would be for breach of contract.  *Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864, 869-70 (Va. 2011) ("[B]ecause each particular misrepresentation by [the defendant] related to a duty or an obligation that was specifically required by the . . . [c]ontract, . . . [the defendant's] misrepresentations did not give rise to a cause of action for actual fraud."); *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293 (Va. 2007) ("[I]n order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." (internal quotation omitted)); *Foreign Mission Bd. v. Wade*, 409 S.E.2d 144, 148 (Va. 1991) (same); *Global Bankcard Servs., Inc. v. Global Merchant Servs., Inc.*, 2011 WL 2268057, at *5 (E.D. Va. June 7, 2011) (same).  Here, Apple has alleged no duty to speak (to disclose the ADC patents) other than the claimed duty imposed by HTC's and ADC's alleged contract with ETSI.  Claims ¶¶ 75-76.  Consequently, the remedy, if any, lies in contract and not in fraud.  And as discussed above, there is no viable contract claim here.

**B.      Apple Does Not and Cannot Allege the Elements of a Fraud Claim**

Apple also has not pled the required elements for a claim of fraud.

<u>False representation</u>:  Apple has not alleged false representation.  The basis of its claim is that, by their silence, ADC and HTC "represented" (by silence) that the ADC patents were not essential to the relevant standard.  *See* Claims ¶ 78.  But Apple has not alleged facts showing that this "representation" was in fact false.  As discussed above, Apple has not affirmatively alleged that the ADC patents are essential; it merely alleges without foundation that the patents are *purportedly* essential.  Thus, Apple cannot allege that the "representations" at issue are false

15

because Apple's own claims concede that the patents may not be essential.  *See id.* ¶ 58.  Indeed, Apple's own assertion in the ITC case that its devices implement the Standard without infringing the ADC patents is an admission that the allegedly "false" representations in this action were in fact true when made and that no duty to speak was ever invoked.

Of a material fact:  Apple fails to allege any representations or omissions by HTC of a material fact.  Apple only alleges omissions by HTC that allegedly occurred *after* HTC purchased the patents, years after adoption of the Standard.  Because the Standard was admittedly already "locked in" at that point, *id.* ¶ 28, any representations or omissions by HTC concerning the essentiality of those patents would have been immaterial to Apple.

Made intentionally and knowingly:  Nor has Apple met the third element that the alleged false representation be made intentionally and knowingly.  Apple's allegations that HTC intentionally and knowingly chose to make fraudulent misrepresentations and omissions to deceive ETSI are implausible because HTC has not yet determined whether the ADC patents are in fact essential to the Standard.  *See* Macy Decl. Ex. 1 at 5-6.  As Apple itself concedes, HTC has repeatedly made disclosures in those instances in which it actually believes that it has patents that are essential to implement standards being developed.  Moreover, because the very process of enforcing a patent against an accused infringer requires disclosure of the patent (just as the '219 and '944 patents were disclosed when HTC asserted them against Apple), no patent owner could ever intend fraudulently to "conceal" a truly essential patent from an SSO and pull off the type of fraud Apple conjures here.  The allegation that HTC (and ADC) ever intended to commit fraud or otherwise deceive the standard setting organizations is simply implausible.

Reliance:  Apple does not allege that it ever relied on any representations (or omissions) HTC made because, according to Apple, any such representations were made after the Standard

16

was already "locked in."   Claims ¶ 28.   Yet those alleged acts of concealment (in connection with HTC's disclosures of different patents it deemed essential) took place after HTC filed its actions against Apple first in the District of Delaware and then in the ITC.   *See id.* ¶ 80; *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (reliance on the representations must be "reasonable").

<u>Damages</u>:  Finally, Apple cannot show any damages from any alleged representations by HTC because the relevant standard was adopted years before HTC ever acquired the patents. Consequently, any damages Apple may have suffered as a result of implementing the Standard could not have been caused by HTC's alleged post-adoption omissions.

### C.      Apple Does Not and Cannot Allege a Conspiracy to Commit Fraud

Apple alleges that HTC conspired with ADC to commit fraud.  But again, Apple fails to allege the required elements of civil conspiracy:   (1) that two or more persons engaged in concerted action; (2) to accomplish some criminal or unlawful purpose, or some lawful purpose by some criminal and unlawful means; and (3) that actual damages resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy.   *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 549 (E.D. Va. 2000).   "To survive demurrer, an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose."   *Station # 2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010).   "[A] conspiracy merely to breach a contract that does not involve an independent duty arising outside the contract is insufficient" because "[n]on-performance of a contractual promise does not, without more, create a basis for recovery in tort" and is not unlawful.   *Id.*  Here, at best, Apple has alleged only a conspiracy to breach contractual disclosure obligations – and in fact has alleged *facts* showing nothing more than that ADC agreed to sell and HTC to buy the ADC patents.  Even if Apple had

alleged a breach of contract, and it plainly has not, a breach of contract is not unlawful by itself, and there is therefore no conspiracy to commit an unlawful act.

Nor can Apple allege that HTC and ADC engaged in "concerted action" to breach a duty to disclose the ADC patents. "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" *Rollston v. Commonwealth*, 399 S.E.2d 823, 827 (Va. Ct. App. 1991) (quoting BLACK'S LAW DICTIONARY 262 (5th ed. 1979)). Here, Apple does not and cannot allege that HTC and ADC both planned and agreed not to disclose the '219 and '944 patents to the SSO. Indeed, the facts alleged by Apple show (1) that ADC made a decision not to disclose the patents long before ever entering into discussions with HTC to purchase the patents and (2) that once ADC sold the patents to HTC, ADC no longer had an interest in whether HTC disclosed them. *See* Claims ¶¶ 75-79. There was no agreed concerted action to commit an unlawful act.

## IV.   THE PROMISSORY ESTOPPEL CLAIM SHOULD BE DISMISSED

### A.   Promissory Estoppel is Not a Cognizable Cause of Action

Promissory estoppel is not a cognizable cause of action in Virginia. *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009); *see also WJ Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512, 516 (Va. 1997) ("[P]romissory estoppel is not a cognizable cause of action in the Commonwealth, and we decline to create such a cause of action."); *Kenny v. Bank of Am., N.A.*, 2011 WL 6046452, at *3 n.1 (E.D. Va. Dec. 5, 2011) (same; dismissing claim with prejudice). Apple's promissory estoppel claim should, therefore, be dismissed with prejudice.

### B.   Apple Does Not and Cannot Allege the Elements of Promissory Estoppel

In those jurisdictions (other than Virginia) where promissory estoppel is recognized, it requires the plaintiff to demonstrate a promise, reasonable reliance, and resulting injury under

circumstances where injustice can be avoided only by enforcing the promise.  *See, e.g.*, *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (defining elements of promissory estoppel under Ohio law).  Here, Apple does not allege sufficiently that HTC ever made a promise that Apple reasonably relied upon and that HTC subsequently broke.  While Apple bases its promissory estoppel claim on the conclusory allegation that "HTC made clear and definite promises to potential licensees, including Apple, that it would license essential patents on FRAND terms," Claims ¶ 84, this allegation is unsupported with any factual allegations of any such "clear and definite promises."

In fact, Apple's allegation contradicts the ETSI rules incorporated by reference into its Claims.  Those rules provide that patent owners do not make any promises to license patents on FRAND terms unless the patent owner (1) discloses essential patents, and (2) thereafter voluntarily submits at its option "an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on [FRAND] terms."  Macy Decl. Ex. 3 ¶¶ 6.1-6.3.  Apple does not allege that HTC has taken either of these steps, and thus no promise to license the ADC patents on FRAND terms was ever made.  Even assuming *arguendo* that ADC or HTC were required to disclose the patents to a standards setting organization, and that ADC or HTC had disclosed the patents and subsequently been asked to license them on FRAND terms, they would have had the option to make or not make such a promise.  In response, ETSI would have had the option to alter the proposed standard or leave it the same.  *See* Claims ¶ 48 (recognizing that the patent owner could choose not to license on FRAND terms, and the organization would have the option then of changing the proposed standard so that it does not infringe).  There can be no promissory estoppel arising from a nonexistent promise.  Nor could there have been any reasonable reliance

19

by Apple on such a promise by HTC because HTC began enforcement of the ADC patents against Apple as soon as it acquired them.

To the extent Apple bases its promissory estoppel claim upon a promise to disclose patents, that promise only applied to "essential" patents, *see id.* ¶ 23, and Apple itself takes the position that the '219 and '944 patents are not essential. In particular, Apple has affirmatively asserted in the ITC action that it implements the Standard without infringing the ADC patents. *See, e.g.*, Macy Decl. Ex. 2 at 1, 25-26. Even if HTC had made a promise to disclose the '219 and '944 patents, which it did not, Apple could not have reasonably relied on such a promise because HTC did not even own the patents until nearly three years after the Standard was already locked in. Accordingly, there can be no claim for promissory estoppel.

## V.   THE ANTITRUST CLAIMS SHOULD BE DISMISSED

Apple asserts four antitrust claims – under Sections 1 and 2 of the Sherman Act, under the Wilson Tariff Act, and also under Virginia state law. The claims all fail for similar reasons, as set forth below.

### A.   The Sherman Act § 1 Claim Should be Dismissed

As relevant here, a claim under Sherman Act § 1 has two elements: (1) an agreement (*i.e.*, a "contract, combination, or conspiracy"), that (2) effects an unreasonable restraint on trade. *See e.g.*, ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 2 (7th ed. 2012). The only HTC-ADC agreement alleged in the Claims that goes beyond the purely conclusory is the agreement under which HTC purchased the ADC patents from ADC. The other allegations of some nefarious conspiracy are set forth with much invective but no *facts*, as *Twombly* requires. Claims ¶¶ 4, 38, 40, 63, 65. Apple concedes that ADC did not even begin to market the patents to HTC until well after the Standard had been set, negating any possible claim of collusion

20

before the setting of the Standard.  *Id.* ¶ 31. The only question, then, is whether Apple has alleged sufficiently that the agreement to buy the '219 and '944 patents was an unreasonable restraint of trade.  *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  It has not.

 *No unreasonable restraint of trade*.   "Unreasonableness" under the Sherman Act means anticompetitive effect.  *Id.*  As then circuit-judge Stephen Breyer explained: "Anticompetitive . . . has a special meaning: it refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process, . . . a process that aims to bring consumers the benefits of lower prices, better products, and more efficient production methods."  *Interface Group v. Mass. Port Auth.*, 816 F.2d 9, 10 (1st Cir. 1987).  The acquisition of the '219 and '944 patents was not anticompetitive for at least four reasons.

 First, ADC and HTC are not competitors in any relevant market alleged by Apple, and the sale of the ADC patents therefore did not alter competition in any such market.  Instead, the acquisition simply transferred patent rights from one company to another.   Acquisitions are subject to antitrust challenge when they threaten harm to the competitive process by eliminating competition between significant competitors, by reducing the number of competitors in a manner that renders collusion or anticompetitive coordination among the remaining firms more likely, or by denying rivals access to important customers or supplies.  *See e.g.*, ANTITRUST LAW DEVELOPMENTS 355-59, 386-90.  Apple makes no such allegations here.  Nor can it.

 Moreover, HTC's agreement with ADC did nothing to enlarge the power of the '219 and '944 patents.  The agreement therefore left whatever exclusionary power the patents had when owned by ADC unaltered.  *See Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (no cause of action where "[t]he patents were an impenetrable barrier to the plaintiff's entry before [the acquisition] and they remained as great a barrier afterwards"); *accord, e.g.*, *City*

*of Pittsburgh v. W. Penn. Power Co.*, 147 F.3d 256, 258 (3d Cir. 1998).  The purchase agreement thus had no effect, let alone an anticompetitive effect, and cannot be challenged as an unreasonable restraint of trade.  *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984) (transfer of a valid patent "has no antitrust significance" and "merely shifts a lawful monopoly into different hands"); *accord, e.g.*, *Digital Sun v. The Toro Co.*, 2011 WL 1044502, at *3 (N.D. Cal. 2011).

Second, the acquisition was accomplished after the Standard had been set.  HTC is aware of no authority holding or even suggesting that antitrust liability can attach to the buyer of a patent who, as here, played no role whatsoever in inducing the relevant standards body to adopt a standard incorporating the patents in question.  Apple advances no allegation suggesting in any way that HTC had anything to do with setting the Standard in 2008, nor that it even was aware of the '219 or '944 patents at the time.  The acquisition therefore could have had no effect on the decision to set the Standard and therefore cannot be assailed as anticompetitive.

The D.C. Circuit's opinion in *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), is instructive.  There the FTC argued that Rambus had fraudulently induced the computer memory standards body (JEDEC) into setting a standard for next-generation memory that could not be used without infringing on patents Rambus did not disclose – a sharp contrast to this case where there is no allegation that HTC had anything to do with setting the Standard in 2008.  But the FTC did not prove that, had Rambus made the disclosure, any different standard would have been set.  Rambus's conduct – however reprehensible – could not give rise to liability because, absent proof that another standard would have been selected, there was no anticompetitive effect. *Id.* at 466 ("JEDEC lost only an opportunity to secure a RAND commitment from Rambus.  But loss of such a commitment is not a harm to competition from alternative technologies in the

relevant markets."). The implications here are clear: nothing in HTC's acquisition of the patents could possibly be alleged to have had an effect on the exclusion of alternative technologies. The acquisition, therefore, cannot be attacked as anticompetitive. *Accord NYNEX Corp. v. Discon, Inc*., 525 U.S. 128, 136-37 (1998) (conduct is not anticompetitive for purposes of Sherman Act § 2 absent proof of exclusion of rivals; deception is not enough); *Townshend v. Rockwell Int'l Corp*., 2000 WL 433505, at *11 (N.D. Cal. Mar. 28, 2000) (no anticompetitive effect where "Townshend's patents issued after the ITU had adopted the V.90 standard").

Third, Apple's allegations about HTC's participation in ETSI following the 2008 adoption of the Standard, *see* Claims ¶ 26, make no difference. Apple does not and cannot allege that the ADC patents were essential to any subsequent modification of the Standard. Nor does or could Apple allege any injury resulting from HTC's post-acquisition conduct. Apple's admission that it (and the rest of the industry) were already locked into the Standard years before HTC acquired the patents refutes any suggestion that HTC's post-acquisition actions had any effect whatsoever on competition.

Fourth, even if the purported nondisclosure had been by HTC, rather than ADC, it would make no difference; Apple would still fail to state a claim. Nowhere in its Claims does Apple allege that, but for the conduct of ADC (or HTC), any other technology would have been selected as the Standard. It alleges only: "On information and belief, had ADC disclosed its IPR . . . , then either the working group, 3GPP, and ETSI or any or all of them, could have considered alternatives rather than the product specification chosen, or developed or modified the specifications to avoid the IPR now alleged to be essential, or ADC would have been required to commit to license on FRAND terms." Claims ¶ 26; *id.* ¶ 97 ("Had ADC and HTC properly disclosed the '219 and '944 patents, 3GPP would have decided to standardize an

23

alternative technology to perform the relevant function and also sought solutions for future LTE standards that are open to the industry.  Alternatively, 3GPP would have continued to leave the relevant function out of the LTE standard.").  No actual alternate technology is ever mentioned.

Apple knows perfectly well that these allegations are insufficient.  Just nine months ago, in its own similar litigation against Samsung, its antitrust claims were dismissed on this very basis.  *Apple Inc. v. Samsung Elec. Co.*, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011).  In that case, in response to patent litigation by Apple, Samsung countered with patent litigation of its own, and Apple struck back by asserting that Samsung violated the antitrust laws by failing to disclose the patents-in-suit to ETSI prior to the establishment of another mobile telephony standard, UMTS.  In dismissing Apple's claims, the court said:

> Apple . . . has failed to allege sufficient facts to support a plausible inference that had Samsung disclosed its intellectual property rights to the SSO, a viable alternative technology performing the same functionality would have been incorporated into the UMTS standard, or the relevant functionality would not have been incorporated into the standard at all. Counterclaims in Reply ¶¶ 55, 178. Apple's allegations are merely conclusory statements that "[h]ad Samsung properly disclosed the existence of its IPR, the relevant SSO would have selected a viable alternative technology or would have decided not to incorporate that proposal into the standard." Counterclaims in Reply ¶ 55. *Without more, for example, factual allegations that there were other technologies considered by the SSO at the time of standard setting, Apple has not met its burden under the pleading standards set forth in* FED. R. CIV. P. 8.

*Id.* at *6 (emphasis added).  Apple's claims here suffer from the same deficiency.[6]

The *Rambus* decision is to the same effect.  The opinion establishes that there is no anticompetitive effect absent some evidence that rivals – such as other technologies – have been excluded by the deception in question.  522 F.3d at 463-67; *see also Townshend*, 2000 WL 433505, at *10-11 (no anticompetitive effect absent allegations that, but for the failure to

---

[6]   Following dismissal of its antitrust claims, Apple later alleged specific "viable alternatives" that were presented to ETSI during the standard-setting process, something it has not done here.  With these revised, specific allegations, a renewed motion to dismiss was denied. *Apple Inc. v. Samsung Elec. Co.*, 2012 WL 1672493, at *8 (N.D. Cal. May 14, 2012).

disclose, the SSO would have adopted an alternative standard that did not include the relevant essential patent).[7]

Fifth, not only does Apple fail to allege that an alternative technology would have been adopted, but Apple also fails to allege that the ADC patents are essential to the Standard. HTC has not declared them essential. HTC sued Apple alleging only that Apple's *implementation* of the Standard infringes, and HTC is now in the process of proving that Apple's implementation infringes the ADC patents. Apple vigorously *denies* that the patents are essential, or even that they are valid or infringed. Under these circumstances, Apple has not, and cannot, allege that a different standard would have been adopted but for the conduct of ADC of which it complains. HTC is aware of no case suggesting that a failure to disclose patents to an SSO is unlawful under any theory in the absence of allegations that the patents are essential to the Standard.

For each of these reasons, Apple's Sherman Act § 1 claim fails because it has not and cannot allege that the acquisition of the patents from ADC was an unreasonable restraint of trade.

***Apple's HSR allegations add nothing.*** In an effort to dress up its antitrust allegations to make them seem more sinister, Apple alleges a nefarious conspiracy between HTC and ADC not to report the acquisition to the Federal Trade Commission under the Hart-Scott-Rodino Act, 15 U.S.C. § 18a ("the HSR Act"). Claims ¶¶ 4, 38, 40, 64. The allegations are reckless, irresponsible, and in any event fail to state a claim.

There is no private right of action under the HSR Act. As noted in *Koppers Co. v. Am. Express Co.*, 689 F. Supp. 1371, 1405 (W.D. Pa. 1988), "[t]he sole purpose of the HSR Act is to provide the Federal Trade Commission with the opportunity to monitor stock acquisitions for

---

[7]    *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) and *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008), are inapposite. Each case involved a refusal by the SSO member to abide by a FRAND commitment the member had made; neither involved a purchase of the relevant patents after the standard had been set.

possible antitrust violations . . . . Accordingly, there is no private right of action under the HSR Act." *See also In re Old Carco LLC*, 406 B.R. 180, 211 (Bankr. S.D.N.Y. 2009).  The HSR Act "was designed to give '*government antitrust agencies* a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated.'" *Koppers*, 689 F. Supp. at 1405 (quoting H.R. REP. NO. 94-1371, at 5 (1976)) (emphasis added).  Nothing in the HSR Act inhibits the FTC, the Department of Justice, or even a private party from challenging an acquisition whether required to be notified under HSR or not.  *E.g.*, *Hologic Inc.*, FTC Docket C-4165 (2006); Complaint, *United States v. 3D Systems Corp.*, No. 1:01CV01237 (D.D.C. June 6, 2001); *Aspen Tech.*, 138 F.T.C. 959 (2004); *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104 (1986) (private challenge).  Accordingly, whether or not the patent acquisition here in issue was HSR reportable makes no difference to Apple's claims.

The accusation that HTC violated the HSR Act by failing to notify the FTC is outrageous and false in any event.  Apple claims that, because the acquisition price aggregated $75 million, the price paid must have exceeded the statutory $66 million threshold in effect in April 2011. Claims ¶¶ 4, 64.  It does so by pretending that all of the value was in the U.S. patents, ignoring the fact that many non-U.S. patents and applications were acquired as well.  *Id.*  The value of foreign assets, such as ADC's non-U.S. patents and applications, is exempt from the filing obligations of the HSR Act.  16 C.F.R. § 802.50 (2006).  Section 5.3 of the Patent Purchase Agreement, a provision that Apple declines to mention in its counterclaims, specifies that the "[b]uyer has assessed the value of the Patent Portfolio under the HSR Act and has determined (1) that the value of the U.S. components of the Patent Portfolio is less than $66 million and (2) that no HSR filing is required."  Macy Decl. Ex. 4 § 5.3.  Nothing in Apple's claims suggests that

HTC lacked a basis to value the non-U.S. assets below $66 million.   The allegation that HTC violated the HSR Act borders on the frivolous.

**B.      No Violation of Sherman Act § 2**

Apple's claims under Section 2 of the Sherman Act should be dismissed for the same reasons as its Section 1 claim.   Just as a claim under Section 1 requires allegations of an unreasonable restraint on trade, Section 2 likewise requires proof of anticompetitive or exclusionary conduct.   *Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).   And where an agreement is found not to be anticompetitive in violation of Sherman Act § 1, there is likewise no basis for a monopolization claim under Section 2.   *E.g.*, *Rambus*, 522 F.3d at 456; *Dickson v. Microsoft Corp.*, 309 F.3d 193, 216 (4th Cir. 2002); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc*., 199 F. Supp. 2d 362, 395 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003); *Imaging Ctr., Inc. v. W. Md. Health Sys., Inc.*, 158 F. App'x 413, 421 n.6 (4th Cir. 2005).

**C.      No Violation of the Wilson Tariff Act**

Section 73 of the Wilson Tariff Act, 15 U.S.C. § 8, does no more than apply the "basic proscriptions of the Sherman Act to trade in imports." *In re Japanese Elec. Prods. Antitrust Litig*., 631 F. 2d 1069, 1072 (3d Cir. 1980).   A failure to plead a viable Sherman Act claim, as here, means that the Wilson Tariff Act claim must fail as well on the same grounds.

**D.      No Violation of Virginia Antitrust Law**

The Virginia Antitrust Act is to be "applied . . . in harmony with judicial interpretation of comparable federal statutory provisions."   VA. CODE. ANN. § 59.1-9.17.   Aside from the interstate commerce requirement, the Virginia Act shares common elements with Sections 1 and

2 of the Sherman Act.  *See Oksanen v. Page Mem'l Hosp.*, 945 F. 2d 696, 710 (4th Cir. 1991).

Because Apple has failed to plead claims under federal law, its state law claims likewise fail.

*See id.*; *Satellite Television v. Cont'l Cablevision*, 714 F.2d 351, 358 n.13 (4th Cir. 1983).

### E.    No Antitrust Injury

Apple's failure to plead "antitrust injury" provides an independent ground for dismissal

of all its antitrust claims.   Under the antitrust injury rule, a "plaintiff can recover only if [its

alleged] loss stems from a competition-reducing aspect or effect of the defendant's behavior."

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (*ARCO*); *Brunswick Corp. v.

Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).   This antitrust injury requirement applies to

*every* type of antitrust claim, *ARCO*, 495 U.S. at 340, and a failure adequately to plead it

warrants dismissal for failure to state a claim.   *E.g.*, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450

(6th Cir. 2007) (en banc) ("[W]hen a complaint by its terms fails to establish this requirement

we must dismiss it as a matter of law"; citing cases).

A plaintiff suing under the antitrust laws to protect its dominant position against

competitive inroads does not suffer antitrust injury.   Thus, for example, in *NicSand*, where the

plaintiff once had a 67% market share and filed suit because the defendant's exclusive

arrangements with customers were eroding that dominant position, the court dismissed the case

for failure to state a claim.   The court refused "to allow this litigation to continue on these

allegations [because doing so would be] to allow one monopolist to sue a competitor for seizing

its market position . . . ." *Id.* at 457.   That is precisely the situation with Apple's case here.

As Apple's Counterclaim makes clear, HTC bought the patents at issue to defend against

claims by Apple and others, only after Apple had obtained an ITC exclusion order for various

HTC devices.   *See* Claims ¶ 3.   Apple acknowledges that HTC's purpose of acquiring the '219

and '944 patents was to gain IP rights that would *enable* HTC's products to remain in the U.S. in competition against Apple and other third parties. *Id.* ¶¶ 4, 53. In sharp contrast to Apple's conduct, HTC's acquisition of patents from ADC was designed to preserve access to the U.S. for its products, not to *exclude* another competitor's products. *Id.* ¶ 53.

The procompetitive aspects of acquisitions of patents for use as defensive measures when faced with patent injunctions or ITC exclusion orders are widely recognized. In that context, patent acquisitions can provide the threat of "mutually-assured destruction" sufficient to induce both sides to enter cross-licenses that permit all of their products to compete on the merits for consumer patronage. As one leading commentator has explained: "Cross licenses commonly are negotiated when each of two companies has patents that may read on the other's products or processes. Rather than blocking each other and going to court or ceasing production, the two enter into a cross license. . . . Thus, cross licenses can solve the complements problem, at least among two firms, and thus be highly procompetitive." Carl Shapiro, *Navigating the Patent Thicket: Cross Licensing, Patent Pools, and Standard Setting*, in INNOVATION POLICY AND THE ECONOMY 119, 127 (Adam Jaffe et al., eds., 2001); *see* Ronald J. Mann, *Do Patents Facilitate Financing in the Software Industry?*, 83 TEX. L. REV. 961, 991 n.154 (2005); Katherine Strandburg et al., *Panel I: Cross-Licensing and Injunctions—The Interplay Between Big Business, Small Business, and Non-Practicing Inventors*, 19 FORDHAM INTELL. PROP., MEDIA & ENT. L.J. 925, 937-38 (2009). That is precisely the situation here.

The relief Apple seeks in this case would unambiguously harm competition. Blocking HTC's ability to use the patents acquired from ADC threatens a situation where Apple's products (*e.g.*, the iPhone 4S) can be sold with no competition from HTC. If that strategy works, Apple will have secured for itself an environment where consumers will face higher prices, lower

29

output, and dramatically reduced consumer choice.  This is the very opposite of what antitrust

laws are designed to achieve; and it is therefore the opposite of an antitrust injury.  Apple's

antitrust claims should all be dismissed accordingly.

## CONCLUSION

For the foregoing reasons, Apple's Counterclaims should be dismissed with prejudice.

Dated: July 25, 2012

Respectfully submitted,

*/s/ Creighton J. Macy*

Jonathan M. Jacobson (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7700
Fax: (212) 999-5899
jjacobson@wsgr.com

Creighton J. Macy (VSB No. 77016)
Susan A. Creighton (*Pro Hac Vice*)
Scott A. Sher (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1700 K. Street, NW Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Fax: (202) 973-8899
cmacy@wsgr.com
screighton@wsgr.com
ssher@wsgr.com

Colleen Bal (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI PC
1 Market Street, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099
cbal@wsgr.com

Laura P. Masurovsky (VSB No. 32379)
Thomas L. Jarvis (*Pro Hac Vice*)
Elizabeth Ferrill (VSB No.72935)
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 408-4000
Fax: (202) 408-4400
laura.masurovsky@finnegan.com
thomas.jarvis@finnegan.com
elizabeth.ferrill@finnegan.com

*Attorneys for Counterclaim Defendant*
*HTC Corporation*

30

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2012, I will electronically file the foregoing and the accompanying Declaration of Creighton J. Macy and Exhibits with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to all counsel of record in this case, including the counsel listed below.  In addition, I will send the confidential exhibits to be filed under seal to counsel listed below via email.

**MEMORANDUM IN SUPPORT OF COUNTERCLAIM DEFENDANT HTC CORPORATION'S MOTION TO DISMISS COUNTERCLAIMANT APPLE INC'S COUNTERCLAIMS**

Ahmed Jamal Davis
Fish & Richardson PC (DC)
1425 K St NW, Suite 1100
Washington, DC 20005
(202) 783-5070
Email: adavis@fr.com

Michael Jude McKeon
Fish & Richardson PC
1425 K St. NW
11th Floor
Washington, DC 20005
(202) 783-5070
Email: mckeon@fr.com

*Attorneys for*
APPLE, INC.

Dated: July 25, 2012                     */s/ Creighton J. Macy*
                                            Creighton J. Macy